1999 ND 143

**STATE of North Dakota, Plaintiff and Appellee**

v.

**James A. BURR, Defendant and Appellant**

No. 980272.

Supreme Court of North Dakota.

July 29, 1999.

Brian D. Grosinger, Assistant State's Attorney, Mandan, for plaintiff and appellee.

Chad R. McCabe, Vinje Law Firm, Bismarck, for defendant and appellant.

Jonathan R. Byers, Assistant Attorney General, Bismarck; amicus curiae, submitted on brief.

SANDSTROM, Justice.

[¶ 1] James A. Burr appeals from the criminal judgment entered upon his conditional plea of guilty to the class A misdemeanor of a failure to comply with convicted sex offender registration. Because his conviction of the underlying sexual offense occurred before sexual offender registration law was enacted, he argues its application to him is ex post facto punishment. We affirm.

I

[¶ 2] On May 11, 1991, James Burr was charged with Gross Sexual Imposition for forcing a 35–year–old woman to engage in a sex act. The charge was reduced to Sexual Imposition, and Burr pled guilty and was sentenced to 18 months in jail with all but 45 days suspended for two years. At the time of sentencing, he was not required to register as a sexual offender.

[¶ 3] North Dakota's sex offender registration statutes were first enacted in 1991. 1991 N.D. Sess. Laws chs. 124, 136. Separate statutes dealt with the registration of sexual offenders and offenders against children, but neither statute was made retroactive. *Id.* Only offenders convicted after the effective dates of the statutes were required to register. For offenders who committed crimes against minors, district courts were given the option to require registration. A person could not be compelled to register, however, unless the requirement was stated on the court records. 1991 N.D. Sess. Laws ch. 136, subsection 2.

[¶ 4] The 1993 North Dakota State Legislature combined "offenders against children" and "sexual offenders" registration

into a single statute. 1993 Sess. Laws ch. 129, § 3.[1] The last sentence of subsection 2 was changed from "[t]he court may not require a person to register unless the court states this fact on the court records" to read "[t]he court shall require a person to register by stating this requirement on the court records." *Id.* at subsection 2.

[¶ 5] In subsections a, b, and c of N.D.C.C. § 12.1–32–15(3), the 1995 legislature added three categories of offenders to those required to register. 1995 Sess. Laws ch. 139, § 1. The category of offenders added in subsection c required that James Burr be notified of his·obligation to register. His conviction, although not requiring registration until 1995, occurred within the ten-year retroactive period provided for in N.D.C.C. § 12.1–32–15(3)(c).

[¶ 6] In October 1996, Burr acknowledged a duty to register when notified to do so by the Bureau of Criminal Investigation. On October 15, 1996, he registered as a sexual offender with the Mandan Police Department. At that time, Burr was given a green copy of the registration form with language advising him of his duty to inform law enforcement if he made any change at all in his address, and of his duty to register with a new city or county law enforcement agency if he moved to another city or county. Burr subsequently moved to Bismarck, but failed to notify the Mandan Police Department of his move, thus violating the requirements of his registration and leading to his guilty plea and conviction for failure to register. N.D.C.C. § 12.1–32–15(6).

[¶ 7] Burr appeals from the criminal judgment of the South Central Judicial District Court. The district court had jurisdiction under N.D.C.C. § 27–05–06. This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28–27–01.

---

1. Since the 1993 change in definitions, the term "offenders against children" applies only to nonsexual offenses.

## II

[¶ 8] Burr argues his motion to dismiss should have been granted because he pled guilty to a sexual offense prior to the enactment of N.D.C.C. § 12.1–32–15(3), and the requirement that he register now as a sexual offender is unconstitutional because it is retroactive and is ex post facto punishment.[2]

[¶ 9] Whether a statute is unconstitutional is a question of law, and the statute will be upheld unless its challenger demonstrates the statute's unconstitutionality. *Best Products Co., Inc. v. Spaeth,* 461 N.W.2d 91, 96 (N.D.1990). An act of the legislature is presumed to be correct, valid, and constitutional, and any doubt about its constitutionality must, where possible, be resolved in favor of its validity. *Southern Valley Grain Dealers Ass'n v. Board of County Comm'rs of Richland County,* 257 N.W.2d 425, 434 (N.D.1977). A party raising a constitutional challenge should bring up his "heavy artillery" or forego the attack entirely. *State v. Harmon,* 1997 ND 233, ¶ 33, 575 N.W.2d 635 (on petition for rehearing); *Southern Valley Grain Dealers Ass'n,* at 434. Because this is a question of law, it is fully reviewable on appeal. *Moran v. North Dakota Dep't of Transp.,* 543 N.W.2d 767, 769 (N.D.1996).

### A

[¶ 10] North Dakota's sexual offender registration statute provides, in part:

2. Burr's arguments often fail to distinguish which constitution is being relied upon, and he has made no particularized arguments regarding the North Dakota Constitution. When an argument relies primarily on federal precedent, it is analyzed under the federal Constitution. *See Ohio v. Robinette,* 519 U.S. 33, 37, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

3. North Dakota is not the only state requiring sex offenders to register. Every other state and the District of Columbia has a sex offender registration statute of some variety. *See* Ala.Code §§ 13A–11–200 to 203; Alaska Stat.

3. After a person has pled guilty to or been found guilty of a crime against a child or an attempted crime against a child, or after a person has pled guilty or been found guilty as a sexual offender, the court shall impose, in addition to any penalty provided by law, a requirement that the person register, within ten days of coming into a county in which the person resides or is temporarily domiciled, with the chief of police of the city or the sheriff of the county if the person resides in an area other than a city. The court shall require a person to register by stating this requirement on the court records. A person must also register if that person:

 a. Is incarcerated or is on probation or parole on August 1, 1995, for a crime against a child or as a sexual offender;

 b. Has pled guilty or nolo contendere to, or been found guilty of, an offense in a court of another state or the federal government equivalent to those offenses set forth in subdivisions a and c of subsection 1; or

 c. Has pled guilty to or been found guilty of a crime against a child or as a sexual offender within ten years prior to August 1, 1995.

N.D.C.C. § 12.1–32–15(3).[3] Burr argues requiring him to register under this sec-

§§ 12.63.010 to 12.63.100, 18.65.087; Ariz. Rev.Stat. Ann. §§ 13–3821 to 13–3826; Ark. Code Ann. §§ 12–12–901 to 12–12–920; Cal.Penal Code § 290 to 290.9; Colo.Rev. Stat. Ann. § 18–3–412.5; Conn. Gen.Stat. Ann. § 54–102r; Del.Code Ann. tit. 11 § 4120; D.C.Code Ann. §§ 24–1101 to 24–1117; Fla. Stat. Ann. § 775.21; Ga.Code Ann. § 42–1–12; Haw.Rev.Stat. § 707–743; Idaho Code §§ 18–8301 to 18–8311; 730 Ill. Comp. Stat. Ann. 150/1 to 150/10; Ind.Code Ann. §§ 5–2–12–1 to 5–2–12–13; Iowa Code Ann. §§ 692A.1 to 692A.15; Kan. Stat. Ann. §§ 22–4901 to 22–4909; Ky.Rev.Stat. Ann. §§ 17.500 to 17.540; La.Rev.Stat. Ann. §§ 15.540 to 549; Me.Rev.Stat. Ann. tit. 34–

tion violates due process and is an ex post facto law. *See* U.S. Const. art. 1, sec. 10; N.D. Const. art. I, sec. 18. This Court has defined an ex post facto law:

1. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2. Every law that aggravates a crime, or makes it greater than it was, when committed. 3. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4. Every law that alters the legal rules of evidence and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*State v. Jensen,* 333 N.W.2d 686, 693–94 (N.D.1983) (quoting *State v. Pleason,* 56 N.D. 499, 218 N.W. 154, 155 (1928) (quoting *Calder v. Bull,* 3 U.S.(Dall.)386, 1 L.Ed. 648 (1798))). No statute can be an ex post facto law prohibited by the United States Constitution unless it makes previously legal conduct criminal or increases the punishment for an existing crime. *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (citing *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884)).

 [¶ 11] The legislature is free to apply statutes retroactively unless doing so would result in ex post facto application. *State v. Cummings,* 386 N.W.2d 468, 471 (N.D.1986). A law imposing a collateral consequence of a conviction may be applied retroactively if the purpose is not to punish the offender but to protect some other legitimate interest. *See State v. Ward,* 123 Wash.2d 488, 869 P.2d 1062, 1068 (1994) (sex offender registration statute is retrospective, but it does not alter the standard of punishment that existed under prior law); *State v. Noble,* 171 Ariz. 171, 829 P.2d 1217, 1224 (Ariz.1992) (the retrospective application of the sex offender registration statute does not punish and is not unconstitutional). North Dakota Century Code, section 12.1–32–15(3), is retroactive, but the important question becomes whether it is regulatory or punitive. *See United States v. Ward,* 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (finding the ex post facto clause applies only to criminal punishment and not to remedial regulations). We first determine whether the legislature intended to punish an offender for a past act "or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation." *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960).

 [¶ 12] "In ascertaining legislative intent, we look first at the words used in the statute, giving them their ordinary, plain-language meaning." *Estate of Thompson,* 1998 ND 226, ¶ 7, 586 N.W.2d 847 (citing *Shiek v. North Dakota Workers Comp. Bureau,* 1998 ND 139, ¶ 16, 582 N.W.2d 639). If the language of a statute is clear and unambiguous, the legislative intent is presumed clear from the face of

A, §§ 11001 to 11144; Md. Ann.Code art. 27, § 792; Mass. Gen. Laws Ann. Ch. 22c, § 37; Mich. Comp. Laws Ann. §§ 28.721 to 28.732; Minn.Stat. Ann. § 243.16; Miss.Code Ann. §§ 45–33–1 to 45–33–19; Mo. Ann. Stat. §§ 589.400 to 589.425; Mont.Code Ann. §§ 46–23–501 to 46–23–511; Neb.Rev.Stat. §§ 29–4001 to 29–4013; Nev.Rev.Stat. Ann. §§ 179D.350 to 179.D490; N.H.Rev.Stat. Ann. §§ 651–B:1 to 651–B:9; N.J. Stat. Ann. §§ 2C:7–1 to 2C:7–11; N.M. Stat. Ann. §§ 29–11A–1 to 29–11A–8; N.Y. Correct. Law §§ 168 to 168–v; N.C. Gen.Stat. §§ 14–208.5 to 14–208.25; Ohio Rev.Code Ann. §§ 2950.01 to 2950.99; Okla. Stat. Ann. Tit. 57, §§ 581 to 588; Or.Rev.Stat. §§ 181.594 to 181.605; Pa. Stat. Ann. Tit. 42, §§ 9791 to 9799.5; R.I. Gen. Laws §§ 11–37.1–1 to 11–37.1–19; S.C.Code Ann. §§ 23–3–400 to 23–3–490; S.D. Codified Laws §§ 22–22–31 to 22–22–41; Tenn.Code Ann. §§ 40–39–101 to 40–39–110; Tex.Code Crim. P. Ann. art. 62.01 to 62.12; Utah Code Ann. § 77–27–21.5; Vt. Stat. Ann. tit. 13 §§ 5401 to 5413; Va.Code Ann. §§ 19.2–298.1 to 19.2–298.3, 19.2–390.1; W. Va.Code §§ 61–8F–1 to 61–8F–10; Wis. Stat. Ann. §§ 301.45 to 301.46; Wyo. Stat. Ann. §§ 7–19–301 to 306. Statutes of this kind are popularly referred to as "Megan's law."

the statute. *Id.* (quoting *Medcenter One, Inc. v. North Dakota State Bd. of Pharmacy,* 1997 ND 54, ¶ 13, 561 N.W.2d 634). If the statutory language is unclear or ambiguous, we often use extrinsic aids to interpret the statute. *Id.* (citing *Hassan v. Brooks,* 1997 ND 150, ¶ 5, 566 N.W.2d 822). When interpreting an ambiguous statute, and "a public interest is affected, an interpretation is preferred which favors the public. A narrow construction should not be permitted to undermine the public policy sought to be served." *Id.* (quoting 2B Norman J. Singer, Sutherland Stat. Constr. § 56.01 (5th ed.1992)).

 13] The language of N.D.C.C. § 12.1–32–15(3) is clear—the registration requirement is applied to anyone convicted of a sexual offense as defined by the statute, and by anyone who was convicted within ten years prior to August 1, 1995. The statutory language gives no indication, however, whether the legislature intended the statute to punish. In that regard, the legislative history is helpful. Assistant Attorney General Robert Bennet testified:

> These amendments to the registration law are a reaffirmance of the underlying purpose of the registration requirement. The registration law is not imposed for punishment purposes, but, rather, for regulation of the offenders required to register. The registration information provided by the listed offenders is necessary to aid in the investigation and apprehension of offenders and to protect the health, safety, and welfare of the members of the local community and citizens of this state.

*Hearing on H.B. 1152 Before the House Judiciary Committee,* 54th N.D. Legis. Sess. (Jan. 9, 1995).[4] Based on the legislative history, we conclude the intent was not to punish, and nothing in the language

of the registration statute indicates the registration requirement is punishment or an additional penalty for the crime. *See* N.D.C.C. § 12.1–32–15(3).

■

[14] [¶ 14] The legislature's purpose, however, is not conclusive, and our inquiry does not end with the examination of the statute or its legislative history. We must also examine whether the actual effect of registering as a sex offender is punitive. *Ward,* 448 U.S. at 248–49, 100 S.Ct. 2636. In *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the United States Supreme Court provided guidance in analyzing whether a law is punitive or remedial, and factors to be considered include:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned....

Because sex offender registration is required following the conviction of an underlying crime, there will necessarily be a finding of scienter, and the underlying behavior is, of course, criminal. *State v. Manning,* 532 N.W.2d 244, 247–48 (Minn. Ct.App.1995). The remaining five factors are helpful in our analysis.

1. Whether Registration is an Affirmative or Restraint.

[15] [¶ 15] Burr argues that because registration impairs mobility, subjects him

---

4. Bennett was asked by Rep. John Mahoney whether he was "comfortable with the constitutional aspects of the retroactive aspects of [the prospective law] going back 10 years...." Bennett answered: "This really does not relate back to the original conviction

in that it is not an additional penalty." *See Hearing on H.B. 1152 Before the House Judiciary Committee,* 54th N.D. Legis. Sess. (Jan. 9, 1995) (testimony of Assistant Attorney General Robert Bennett).

to increased police scrutiny, and is a stigma that can last a lifetime, the registration requirement amounts to a "badge of infamy."

[¶ 16] The registration requirement alone imposes no additional burdens on offenders. Although offenders must give notice if they relocate, this requirement alone does not restrain their movement. An offender's conviction is a matter of public record regardless of registration. We also hold the physical act of registration does not create an affirmative disability or restraint. Collecting information about sex offenders to aid law enforcement does not restrain a sex offender's movement. Sex offenders are still free to move within their city or county, or from one city or county to another, as long as they register with the new city or county. N.D.C.C. § 12.1–32–15(6).

## 2. Whether Registration is Historically Punishment.

[¶ 17] Registration has not traditionally been viewed as punishment. *See Lambert v. California*, 355 U.S. 225, 229, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) (city ordinance requiring felons to register was designed for the convenience of law enforcement). Registration is traditionally a government method of making available relevant and necessary information to law enforcement. The Illinois Supreme Court said it well:

> The statute prescribes a duty on the part of an individual on the basis of a criminal conviction. The question to be answered is whether this duty is punishment. Traditional notions of punishment aid little in the resolution of this issue since the statutory duty is neither imprisonment nor a fine. It imposes no restraints on liberty or property. In short, by traditional definition, the duty to register is not punishment.

*People v. Adams*, 144 Ill.2d 381, 163 Ill. Dec. 483, 581 N.E.2d 637, 640 (1991). We are not persuaded registration has traditionally been punishment.

## 3. Whether Registration Promotes the Traditional Aims of Punishment.

[¶ 18] The next pertinent *Mendoza–Martinez* factor is whether the sex offender registration statute promotes retribution or deterrence, the traditional aims of punishment. Requiring registration is not retribution, because the offender has generally served time or been given some other form of punishment and the payment demanded for the crime cannot be found in incidental registration. Although registration may have a minimal deterrent effect on the offender, we conclude an offender may be deterred from reoffending because of the conviction and punishment already served, whether required to register or not. *Ward*, 869 P.2d at 1073. The courts applying these factors have routinely found the deterrent effect of registration laws to be incidental and minimal when compared with the threat of conviction and long-term incarceration for a new offense. *State v. Taylor*, 67 Wash.App. 350, 835 P.2d 245, 249 (1992); *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995); *Adams*, 144 Ill.2d 381, 163 Ill.Dec. 483, 581 N.E.2d 637.

## 4. Whether Registration has Alternative Purposes other than Punishment.

[¶ 19] The legitimate public interest in having sexual offenders register with police is to notify law enforcement of the person's presence in their community. Recidivism rates among sexual offenders are high, *see* John S. Murray, *California's Chemical Castration Law: A Model for Massachusetts?*, 24 New England Journal on Criminal and Civil Confinement 729, 734 (1998) (citing sources showing recidivism rates among sexual offenders can be as high as 80 percent), and the public is better served when police are notified of a sexual offender's presence in their community. One commentator said "[t]he probability that a sex offender will commit a similar crime in the future can be predicted from known prior criminal sexual conduct," citing a source indicating child abus-

ers and pedophiles may have a 30 percent recidivism rate. Sherry L. Scott, Comment, *Fairness to the Victim: Federal Rules of Evidence 413 and 414 Admit Propensity Evidence in Sexual Offender Trials*, 35 Houston L.Rev. 1729, 1739 (1998) (citing Thomas J. Reed, *Reading Gaol Revisited: Admission of Uncharged Misconduct Evidence in Sex Offender Cases*, 21 Am. J.Crim. L. 127, 154–56 (1993)). A bigger problem with recidivism rates among sexual offenders is that since many sexual crimes are not reported, more accurate rates are difficult to establish. *Id.* The National Institute of Justice recently claimed a " 'cure' for sex offend[ers] is no more available than is a cure for epilepsy or high blood pressure.' " Katie Isaac, Note, *Kansas v. Kendricks: A Perilous Step Forward in the Fight Against Child Molestation*, 35 Houston L.Rev. 1295, 1327 (1998) (quoting Mike Tharp, *Tracking Sexual Impulses: An Intrusive Program to Stop Offenders From Striking Again*, U.S. News & World Report, July 7, 1997, at 34). Tharp reports nationwide recidivism rates for sex offenders are thirteen to twenty-seven percent higher than for other criminals. *Id.*

[¶ 20] Given the broad view of the nonpunitive purposes recognized by the courts, the party challenging the statute is required to provide the "clearest proof" that the statutory scheme is so punitive either in purpose or in effect as to negate the state's nonpunitive intent. *See Russell v. Gregoire*, 124 F.3d 1079, 1087 (9th Cir. 1997) (citations omitted). Burr has not met this burden, and we are not persuaded the nonpunitive aspects of the statute are outweighed by the punitive.

### 5. Whether Registration is Excessive in Relation to Nonpunitive Purposes.

[¶ 21] Under this *Mendoza–Martinez* factor, the registration statute must not be excessive in relation to its nonpunitive purpose. The mere fact a sex offender must register does not remove the constitutional protections provided all citizens. While the known sex offender in a community may be a suspect any time an offense occurs, that person is still provided constitutional guarantees of due process. There is little doubt about the noble intent of these laws: to protect children and others from previously convicted sex offenders near them in the community. Registration is not, therefore, excessive in relation to other goals.

[¶ 22] Our double-jeopardy analysis in driving-under-the-influence cases is similar. In *State v. Zimmerman*, 539 N.W.2d 49, 55 (N.D.1995), we held administrative suspension of a driver's license for driving while intoxicated or under the influence of alcohol serves a remedial purpose and does not constitute punishment for double-jeopardy analysis and thus does not preclude subsequent criminal DUI prosecutions. Administrative suspensions serve a remedial, nonpunitive goal of getting unsafe drivers off public highways. *Id.* Any punitive or deterrent value is merely an incidental effect, and suspensions are not overwhelmingly disproportionate to the remedial purpose. *Id.*

[¶ 23] In *Noble*, 829 P.2d at 1221, the Arizona Supreme Court applied the *Mendoza–Martinez* factors and found them to focus "appropriate attention on the effects of the registration requirement on convicted sex offenders and on the rationality between the requirement and its purported non-punitive functions." The Arizona Supreme Court upheld the state's sex offender registration statute against an ex post facto attack by reasoning the registration requirements did not constitute punishment. *Noble*, at 1224. One of the primary reasons for upholding the statute was that nothing in the legislative history of the statute indicated an intent to punish. Several other state courts have held the registration of a sex offender is a collateral consequence of the conviction, rather than a direct or punitive one. *Johnson v. State*, 922 P.2d 1384, 1387 (Wyo.1996); *Ward*, 869 P.2d at 1076; *State v. Young*, 112 Ariz. 361, 542 P.2d 20, 22 (Ariz.1975); *In re*

*B.G.M.*, 929 S.W.2d 604, 606–07 (Tex.Ct. App.1996); *see also People v. Starnes*, 273 Ill.App.3d 911, 210 Ill.Dec. 417, 653 N.E.2d 4, 7 (1995) (sex offender registration act did not violate the ex post facto clause because the statute was not penal in nature and did not amount to punishment, but rather, certification and registration are a collateral consequence of a defendant's conviction for a sex offense and not a penalty or enhancement of the sentence).

[¶ 24] In a case similar to this one, the Minnesota court upheld a conviction and rejected the defendant's contention that applying the statute to a felon who was convicted before it took effect violated the ex post facto prohibitions of the United States and Minnesota Constitutions. *Manning*, 532 N.W.2d 244. The defendant was convicted in 1988, and the registration law did not become effective until 1991. Observing that an ex post facto law is one that renders an act punishable in a manner in which it was not punishable when it was committed, the court said it must determine whether the legislature intended to punish an offender for a past act, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation. The court said the registration statute did not impose an affirmative disability and did not advance the traditional aims of punishment. Although acknowledging that former offenders may be slightly burdened because they could be scrutinized when local sex crimes occur, the court found the additional burden was not excessive in relation to the important regulatory purpose served.

### III

[¶ 25] This Court has interpreted N.D.C.C. § 12.1–32–15. In *State v. Breiner*, 1997 ND 71, ¶ 21, 562 N.W.2d 565, three justices concluded the failure of the district court to advise a defendant of the registration requirement at the time of sentencing required a reversal of the order denying a motion to withdraw the guilty plea. Breiner pled guilty on May 1, 1996, and did not fall within one of the three categories of offenders required to register under the 1995 amendment. *Breiner*, at ¶ 2. Breiner moved to withdraw his guilty plea when he discovered he was required to register, and the plurality ruled that he might do so because the district court failed to notify him he had to register. *Id.* at ¶ 11. Admitting this was the minority view in the United States, the plurality was "persuaded by the California Supreme Court's rationale that the registration requirement imposes a grave, and even onerous, additional punishment, especially for a misdemeanor offense." *Id.* at ¶ 8.

[¶ 26] To reach this conclusion, the plurality relied on two California cases. *Breiner*, 1997 ND 71, ¶ 8, 562 N.W.2d 565 (relying on *People v. McClellan*, 6 Cal.4th 367, 24 Cal.Rptr.2d 739, 862 P.2d 739 (1993); *In re Birch*, 10 Cal.3d 314, 110 Cal.Rptr. 212, 515 P.2d 12 (1973)). In the *Breiner* and California cases, the defendants were not told by the trial court of the registration requirement. In this case, Burr could not have been notified because the law took effect after he was convicted. North Dakota Century Code section 12.1–32–15(3) clearly sets forth three situations under which sex offenders would still be required to register even though they had not been advised by the district court of the requirement to register, distinguishing this case from *Breiner*.

[¶ 27] A nonregistered offender within any of the three categories added in 1995 would not have been advised by any North Dakota judge of the duty to register. Those offenders on probation or parole would have already been sentenced. Offenders convicted in other states would not have been advised by judges in those states about North Dakota's registration requirements. An offender like Burr could not have been told of the duty to register, because he had no duty until August 1, 1995. Unlike *Breiner*, James Burr registered as an offender instead of attempting to withdraw his plea of guilty

to the crime of sexual imposition. That conviction stands, and the criminal conduct he is charged with in this case is failing to comply with registration provisions in light of the earlier conviction.

[¶ 28] Because *Breiner* was a plurality not on point, this Court's ruling regarding the remedial or punitive nature of N.D.C.C. § 12.1–32–15(3) is inconclusive. The plurality analysis in *Breiner* focused on the district court's failure to notify Breiner, before he pled guilty, that he had to register as a sex offender. To the extent *Breiner* is inconsistent with this opinion, it is expressly overruled.

IV

[¶ 29] Although at ¶ 39 the dissent says it would hold the "application to Burr of subsections 3(c) [the registration requirement] and 11 [the dissemination provision] violates both ex post facto clauses," at ¶ 69 the dissent says, "I agree with the majority that the *registration* requirements of N.D.C.C. § 12.1–32–15 do not implicate ex post facto concerns." The defendant was charged only with violating the registration requirements. The defendant moved the district court "to find N.D.C.C. § 12.1–32–15(3)(c) unconstitutional as an ex post facto provision." The district court ruled against the defendant on that motion. The defendant entered a conditional plea of guilty. Under N.D.R.Crim.P. 11(a)(2), a conditional guilty plea preserves only "the right, on appeal from the judgment, to review of the adverse determination of any special pretrial motion." As we explained in *State v. Kraft*, 539 N.W.2d 56, 58 (N.D.1995):

> Persons who voluntarily plead guilty to an offense waive their right to challenge on appeal nonjurisdictional defects that occur before the entry of the guilty plea, including alleged violations of constitutional rights. *State v. Slapnicka*, 376 N.W.2d 33 (N.D.1985); *see Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). Under Rule 11(a)(2), NDRCrimP, a defendant may

preserve the right to appeal "the adverse determination of any specified pretrial motion." A defendant who enters a conditional plea agreement, but fails to preserve issues for review in the agreement, cannot raise those issues on appeal. *See United States v. Ramos*, 961 F.2d 1003 (1st Cir.1992); *United States v. Ryan*, 894 F.2d 355 (10th Cir.1990). Burr preserved only the registration requirement issue. All other issues were waived.

[¶ 30] Burr did not raise and preserve the issue of dissemination. None of the cases cited by the dissent find an ex post facto violation for a defendant convicted of violating a registration requirement. Most of the cases relied on by the dissent were direct challenges to statutory provisions by civil declaratory judgment, injunction, or section 1983 civil rights cases. *See Doe v. Attorney General*, 425 Mass. 217, 680 N.E.2d 97, 98 (1997) (defendant granted a preliminary injunction against application of notification portion of sex offender statute); *E.B. v. Verniero*, 119 F.3d 1077 (3rd Cir.1997) (issue before the court was the constitutionality of the notification requirements of "Megan's Law"); *Russell*, 124 F.3d 1079 (defendant sex offenders brought § 1983 action challenging state's community notification statute); *Femedeer v. Haun*, 35 F.Supp.2d 852 (D.Utah 1999) (convicted sex offender brought § 1983 action challenging constitutionality of amendments to sex offender notification statute which provided for unrestricted public disclosure of registry information). The other cases are direct challenges to the sentences in the original sex crime cases. *See Noble*, 171 Ariz. 171, 829 P.2d 1217 (defendant appealed following conviction for child molestation and sexual conduct with a minor); *Adams*, 144 Ill.2d 381, 163 Ill.Dec. 483, 581 N.E.2d 637 (defendant appealed from order which certified him as habitual child sex offender).

[¶ 31] The only two cases cited by the dissent involving defendants charged with failure to comply with registration require-

ments uphold the convictions in face of claims of ex post facto violation. In the Minnesota case, *Manning*, 532 N.W.2d 244, the defendant was convicted before the statute went into effect. He registered, failed to keep his registration current, was convicted, and challenged his conviction on ex post facto grounds. The Minnesota Court held there was no ex post facto violation. *Id.*, at 249. In the Washington case, *Ward*, 123 Wash.2d 488, 869 P.2d 1062, in face of ex post facto challenges, the court upheld conviction of failure to comply with registration requirements.[5]

[¶ 32] If the issue were properly before us, and if the dissent's analysis of the dissemination provision were correct, the dissent does not say what it would actually do about it in this case. Would the dissent dismiss the charge of failing to comply with the registration requirements? Burr has admitted, "I was convicted of a sexual offender crime in Burleigh County, North Dakota in June of 1991. On October 15, 1996, I complied with the registration requirement by registering with the Mandan Police Department. Subsequently, I relocated to Bismarck, North Dakota, but failed to notify the Mandan Police Department of my move." Without dispute, Burr violated the registration requirements, which the dissent concedes are constitutional.

[¶ 33] Even if the dissemination provisions were unconstitutionally overbroad, Burr would not be excused from complying with the registration requirements. That would be like saying a taxpayer could be excused from filing and paying taxes because the government might unconstitutionally spend some of the money. It would be like saying a driver can refuse to comply with statutory requirements to keep the Department of Transportation informed of the driver's current address because the department was going to disseminate the information in violation of the driver's constitutional rights.

[¶ 34] The dissent asserts the dissemination provisions are unconstitutional as applied to Burr. But none of the cases cited by the dissent support that analysis. Under the laws and cases providing for "tiers" or levels of dissemination, Burr-related information would appear to be subject to full dissemination because Burr was convicted as an adult, violent sex offender. *See Verniero*, 119 F.3d at 1083; *Russell*, 124 F.3d at 1082. *See also* N.J. Stat. Ann. § 2C:7–8c(3); Wash. Rev.Code § 4.24.550(1–8). Even if an argument could be made that our statute could be unconstitutional as applied to some,[6] there is no credible argument that it is unconstitutional as applied to Burr.

[¶ 35] If the issue of dissemination were before us, we would interpret the statute to avoid an unconstitutional result. *E.g.*, *McCabe v. North Dakota Workers Compensation*, 1997 ND 145, ¶ 10, 567 N.W.2d 201 (citations omitted). If we could not, we would strike down only the provision that was constitutionally infirm. *See Capital Elec. Co-op., Inc. v. Public Service Com'n of North Dakota*, 534 N.W.2d 587, 591 (N.D.1995) (unconstitutional provision is severable from remainder of the statute); *State v. Rathjen*, 455 N.W.2d 845, 849 (N.D.1990) (unconstitutional provision of a statute may be severed and the remainder of the statute remains in effect). Burr would still be guilty of violating the constitutionally valid registration requirements.

## V

[¶ 36] After examining the legislative history of N.D.C.C. § 12.1–32–15(3) and applying the *Mendoza–Martinez* factors, we conclude the registration requirement

---

5. This consolidated opinion involved a defendant convicted of failure to register, and a separate case involving another parolee's challenge to the statute.

6. The 1999 Legislature amended N.D.C.C. § 12.1–32–15 to narrow the scope of covered offenders effective August 1, 1999. 1999 N.D. Sess. Laws ch. 131, § 8.

is regulatory in nature and was designed to aid law enforcement agencies by requiring sex offenders to register with local law enforcement and notify them when they move. The retrospective application of the statute to Burr does not violate the ex post facto clause of the United States or North Dakota Constitutions. The purpose of the registration requirement is protection of a legitimate public interest, which imposes a collateral consequence upon conviction, not added punishment.

[¶ 37] The judgment of the district court is affirmed.

[¶ 38] GERALD W. VANDE WALLE, C.J., and WILLIAM A. NEUMANN, J., concur.

KAPSNER, Justice, dissenting.

[¶ 39] Section 12.1–32–15 should serve the beneficial purposes ascribed to it by the majority. The fact, however, that a law may serve a good purpose does not alone satisfy the inquiry of whether the statute violates the ex post facto clauses of the United States and North Dakota constitutions. Under the circumstances of this case, I would hold that the application to Burr of subsections 3(c) and 11 [7] violates both ex post facto clauses. I would hold so because the statute applied to Burr was retroactive, excessive in its scope, unrestrained in the manner that information under the statute could be disseminated, and imposed a significant restraint on his liberty not authorized as a punishment at the time the crime was committed. The enactment of these subsections occurred after Burr had fully served his sentence, completed his probation and been released from supervision for the crime of sexual imposition.

[¶ 40] The retroactive application of a sanction requires analysis under the ex post facto clause, which embodies a principle considered so fundamental to the Framers that it was singled out explicitly as a direct restraint on the legislative au-tonomy of the States. As James Madison observed:

'Bills of attainder, ex post facto laws, and laws impairing the obligations of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the State Constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us nevertheless, that additional fences against these dangers ought not to be omitted. Very properly therefore have the Convention added this constitutional bulwark in favor of personal security and private rights.'

*See State v. Myers,* 260 Kan. 669, 923 P.2d 1024, 1030 (1996) (quoting The Federalist No. 44, at 301 (James Madison) (Jacob E. Cooke ed.1961)). The New Jersey Supreme Court aptly put it: the clause is a "towering constitutional provision[ ] of great importance to individual dignity, freedom, and liberty." *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 388 (1995).

[¶ 41] Pitted against this "constitutional bulwark" in this case is the extraordinarily important role of the State in dealing with the serious harm that perpetrators of sexual crimes cause individual citizens particularly and society generally. In response to the abduction, rape, and murder of Megan Kanka and the growing body of research indicating sex offenders, especially child sex offenders, have a high rate of recidivism, all fifty states now have some form of a sex offender registration. I believe such laws are an appropriate means to protect society. However, when the state retroactively applies a sanction, as it did in applying N.D.C.C. § 12.1–32–15 to Burr, it runs afoul of a fundamental constitutional principle established to protect every member of society from the unfettered power of the state.

---

**7.** These subsections, when originally enacted in 1995, were subsections 2(c) and 10.

## I. North Dakota Application of Ex Post Facto

[¶ 42] As the majority notes, the starting point in any ex post facto analysis is the statement from *Calder v. Bull*, 3 U.S.(Dall.) at 390 (1798), quoted by this Court in *State v. Pleason*, 56 ND 499, 218 N.W. 154, 155 (1928), identifying those legislative acts which engage the restraints of the ex post facto clause:

1. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2. Every law that aggravates a crime, or makes it greater than it was, when committed. 3. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

At issue in this case is the third *Calder* category: whether N.D.C.C. § 12.1–32–15 (1997) "inflicts a greater punishment" on Burr after the commission of his crime than was available when he committed it.

[¶ 43] The earliest analyses of ex post facto issues by this court and the courts of Dakota Territory have focused on the third *Calder* category, whether the newly enacted statute increased the punishment for the crime. *See, e.g., Territory v. Miller*, 4 Dakota 173, 29 N.W. 7 (1886), (holding there was no ex post facto violation because the clear intent and effect of the legislation identifying classes of homicide was to mitigate, not increase, the severity of punishment in certain murder cases).

[¶ 44] Similarly, this court in *State v. Rooney*, 12 N.D. 144, 95 N.W. 513 (1903), *aff'd*, 196 U.S. 319, 25 S.Ct. 264, 49 L.Ed. 494 (1905), held that a new statute controlling the place of confinement and the timing of execution of a convicted murderer was ameliorative. It, therefore, did not violate ex post facto restraints on the legislature. In doing so, this court reiterated the significant protections provided by the constitutional provisions:

The question for determination is this: Was the statute (chapter 99, Laws 1903) under which this judgment was entered ex post facto and void, as applied to appellant? The passage of ex post facto laws is inhibited by both the federal and the state Constitutions. The section of the federal Constitution (section 10, art. 1), to wit, "No state shall pass any ex post facto law," has been frequently considered and expounded by the Supreme Court of the United States, and its interpretation of this supreme law of the land is binding upon this tribunal. The court has said: "The plain and obvious meaning and intention of the prohibition is this: that the Legislatures of the several states shall not pass laws, after a fact done by a subject or citizen, which shall have relation to such fact, and shall punish him for having done it. The prohibition considered in this light, is an additional bulwark in favor of the personal security of the subject, to protect his person from punishment by legislative acts having a retrospective operation." *Calder v. Bull*, 3 U.S.(Dall.) at 390, 1 L.Ed. 648. Justice Chase, in enumerating what laws he considered ex post facto, within the rules and intent of the prohibition, specified "every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed."

*Rooney*, at 514–15.

## II. Ex Post Facto Application to Sexual Offender Registration Statutes

### A. Development of Tests

[¶ 45] In the ex post facto context, the United States Supreme Court has not established any single test to determine when a sanction rises to the level of "punishment." *See Russell v. Gregoire*, 124 F.3d 1079, 1084 (9th Cir.1997) ("the Supreme Court has not articulated a 'formu-

la' for identifying the legislative changes that fall within the [Ex Post Facto] prohibition"); *Roe v. Farwell*, 999 F.Supp. 174, 183 (D.Mass.1998) (the Supreme Court has not produced a single standard and "the applicability of any such framework to sex offender registry provisions is blurry"); *State v. Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570, 580 (1998) (the Supreme Court "has declined to set out a specific test for determining whether a statute is criminal or civil for purposes of applying the Ex Post Facto Clause").

[¶ 46] Several earlier decisions addressing the ex post facto implications of sex offender registration and notification laws have employed, as the majority does, the "test" from *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), to determine whether such laws were "punitive." *See, e.g., State v. Ward*, 123 Wash.2d 488, 869 P.2d 1062, 1068 (1994); *State v. Noble*, 171 Ariz. 171, 829 P.2d 1217, 1221 (Ariz.1992). *Mendoza–Martinez* involved a civil statute which divested American citizenship for draft evaders or military deserters. 372 U.S. at 146, 83 S.Ct. 554. Addressing whether the law was effectively penal in nature and thereby triggering the procedural protections of the Fifth and Sixth Amendments, the Court enumerated factors "traditionally applied to determine whether an Act of Congress is penal or regulatory in character":

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative pur-

pose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned....

*Id.* at 168–69, 83 S.Ct. 554 (footnotes omitted) (brackets added). The Court declared the factors were to be considered in relation to the statute on its face in the absence of "conclusive evidence of congressional intent as to the penal nature of a statute." *Id.* at 169, 83 S.Ct. 554.

[¶ 47] Other courts, however, have refused to utilize the *Mendoza–Martinez* factor analysis. *See Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1262 (3rd Cir.1996) (concluding "*Mendoza–Martinez* is inapplicable outside the context of determining whether a proceeding is sufficiently criminal in nature to warrant criminal procedural protections of the Fifth and Sixth Amendments"); *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367, 397, 400–403 (1995) (rejecting the use of the *Mendoza–Martinez* factors in an ex post facto "punishment" analysis).

[¶ 48] The decisions rejecting use of the *Mendoza–Martinez* factor analysis generally rely on a trio of Supreme Court cases,[8] which, it is argued, cast doubt on the notion that the *Mendoza–Martinez* factors properly frame the ex post facto inquiry. These cases generally have given expressed legislative intent significant deference and have weakened the protections of the ex post facto clause. The courts rejecting the *Mendoza–Martinez* factor analysis, however, either failed to consider or did not have the benefit of the Supreme Court's decisions in *United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) and *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

**8.** *See Department of Revenue v. Kurth Ranch,* 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (whether a tax on illegal marijuana violated the Double Jeopardy Clause); *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (whether in rem civil forfeiture proceedings violated the Excessive Fines Clause); *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (whether civil penalty is punishment under the Double Jeopardy Clause).

[¶ 49] In *Ursery*, the Court considered whether the purportedly "civil" forfeiture of property used to facilitate marijuana violations constituted a second punishment within the meaning of the Double Jeopardy Clause. In holding such forfeiture proceedings were not "punishment," 518 U.S. at 272, 116 S.Ct. 2135 the Court took particular care in distinguishing *Kurth Ranch, Austin,* and *Halper*. *Id.* at 278–88, 116 S.Ct. 2135. The Court concluded these cases had not altered settled precedent holding that "in rem civil forfeitures are neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause." 518 U.S. at 292, 116 S.Ct. 2135.

[¶ 50] After confining *Kurth Ranch, Austin,* and *Halper* to their specific factual circumstances, the *Ursery* Court identified the method of inquiry into whether a statute "punishes" for Double Jeopardy purposes. This inquiry requires an evaluation of (1) whether the legislature intended the sanction to be punitive, and (2) whether "the statutory scheme was so punitive either in purpose or effect as to negate" the legislative intent to establish a remedial, nonpunitive statute. *Ursery*, 518 U.S. at 278, 116 S.Ct. 2135 (quoting *United States v. Ward*, 448 U.S. 242, 248–49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Echoing *Ward*, the Court emphasized, at the second prong, the challenger must show by "the clearest proof" the sanctions imposed "are so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary." *Id.* at 290, 116 S.Ct. 2135.

[¶ 51] Because *Ursery* was a Double Jeopardy case, and because the Court warned against lifting a standard for punishment from one constitutional provision and applying it to another, 518 U.S. at 285–87, 116 S.Ct. 2135 it remained open to question whether the same analysis should be applied in the ex post facto context. A

year later, the Supreme Court implicitly answered this question in the affirmative. In *Hendricks*, the Court held a Kansas statute requiring the involuntary commitment of sexual predators with mental and personality infirmities did not impose punishment in violation of either the Double Jeopardy Clause or Ex Post Facto Clause. 521 U.S. at 371, 117 S.Ct. 2072. The Court undertook only the analysis espoused in *Ursery* to answer both constitutional challenges. *See id.* at 361–71, 117 S.Ct. 2072.

[¶ 52] However, the Court's decisions in *Hendricks* and *Ursery* alter only slightly the *Mendoza–Martinez* analysis. It is now clear a challenger carries a heavy burden to establish "the clearest proof" that the sanctions at issue are punitive in effect. *Hendricks*, 521 U.S. at 361, 117 S.Ct. 2072. It is also clear the factors delineated in *Mendoza–Martinez* are "neither exhaustive nor dispositive" and are to be used merely as guideposts, not as a pass/fail test or in checklist fashion. *Ward*, 448 U.S. at 249, 100 S.Ct. 2636. *Mendoza–Martinez* factors are most helpful where a civil statute must be tested to determine whether constitutional protections have been violated. The statute applied to Burr was part of the criminal code.

[¶ 53] Several federal and state courts have recently applied what has been termed the "intent-effects"[9] test. This test synthesizes the Supreme Court's decisions in *Hendricks, Ursery,* and *Ward. See, e.g., Russell v. Gregoire*, 124 F.3d 1079, 1084 (9th Cir.1997); *State v. Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570, 580 (1998). The intent-effects test provides a two-part test to determine whether the registration and notification requirements of N.D.C.C. § 12.1–32–15 are punitive. Courts examining sexual offender statutes sometimes add a third prong[10] not pertinent to Burr

9. The term "intent-effects" was coined by the Ninth Circuit Court of Appeals in *Russell,* 124 F.3d at 1084.

10. The third prong is whether the effect of the statute is so harsh that "as a matter of degree" it constitutes punishment. *Commonwealth of Pennsylvania v. Gaffney,* —— Pa.

and I believe it decisive in this case to examine our statute under the two-part test.

### B. Application of Intent–Effects Test to § 12.1–32–15

#### 1. Intent of Legislation

[¶ 54] Under the first part of the intent-effects test, a court looks to the legislature's declared purpose as well as the structure and design of the statute for evidence of a punitive intent. *Ursery,* 518 U.S. at 292, 116 S.Ct. 2135. Like the majority, after a careful analysis of the relevant legislative history of § 12.1–32–15 since the statute's enactment in 1991, I recognize the original motivating intent of our legislature included concerns with aiding law enforcement investigation of sex crimes and preventing re-offense.

[¶ 55] Section 12.1–32–15 had its genesis in 1991 N.D. Sess. Laws ch. 136 (Offense Against Children Registration) and 1991 N.D. Sess. Laws ch. 124 (Sexual Offender Registration), later codified as N.D.C.C. § 12.1–32–15 (1991) and N.D.C.C. §§ 12.1–20–18 thru –23 (1991), respectively.

[¶ 56] The "sex offender" statute required a person convicted of certain offenses under N.D.C.C. ch. 12.1–20[11] to register with city or county law enforcement within 14 days of taking residence or temporary domicile in either jurisdiction. N.D.C.C. § 12.1–20–18(2). Upon relocation, the offender was required to notify appropriate law enforcement officials within 10 days. N.D.C.C. § 12.1–20–21.[12]

[¶ 57] To "broaden the scope" of the sexual offender statute to include "crimes against children," the 1991 legislature enacted a second offender registration bill, S.B. 2574, 1991 N.D. Sess. Laws ch. 136, codified at N.D.C.C. § 12.1–32–15 (1991). *See Hearing on S.B. 2574 Before Human Services and Veterans Affairs Committee,* 52nd N.D. Legis. Sess. (Mar. 12, 1991) (testimony of Sen. Larry Robinson). Registration under section 12.1–32–15 was not mandatory. The sentencing court was given discretion to impose the requirement that the offender register within 30 days after coming into the county in which the offender resides or is temporarily domiciled. N.D.C.C. § 12.1–32–15(2). In other words, registration was mandatory under the sex offender registration statute, while offenders committing certain crimes against a child were required to register only if required to do so by the court.

[¶ 58] Under the 1991 version of the child sex offender registration statute, the offender's registration information was "not open to inspection by the public or by any person other than a regularly employed law enforcement officer." N.D.C.C. § 12.1–32–15(8). While the sex offender registration statute did not contain a similar proscription, the legislative history of N.D.C.C. § 12.1–20–20 indicates the offender's registration information was also to be kept confidential. *See Hearing on S.B. 2440 Before Judiciary Committee,* 52nd N.D. Legis. Sess. (Mar. 12, 1991) ("this information is still confidential . . . .") (testimony of Sen. Ray Holmberg).

[¶ 59] Both statutes purported to aid law enforcement investigation in keeping track of sex offenders and to prevent the risk of reoffense due to the higher rate of recidivism among that group. *See Hearing on S.B. 2574 Before Human Services and Veterans Affairs Committee,* 52nd N.D. Legis. Sess. (Mar. 21, 1991) ("The primary pur-

---

——, 733 A.2d 616, 618 (1999); *E.B. v. Verniero,* 119 F.3d 1077, 1093 (3rd Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

11. The offenses included N.D.C.C. §§ 12.1–20–03 (gross sexual imposition); –04 (sexual imposition); –05 (corruption of a minor); –06 (sexual abuse of wards); –07 (sexual as-

sault); –11 (incest). *See* N.D.C.C. § 12.1–20–18(2) (1991).

12. Burr pleaded guilty to sexual imposition on June 25, 1991. The sex offender statute was effective on August 1, 1991; it had no provision for retroactive application. Its provisions did not apply, and were not applied, to Burr.

pose for this bill is law enforcement.") (testimony of Assistant Attorney General Vukelic); *Hearing on S.B. 2440 Before Senate Judiciary Committee*, 52nd N.D. Legis. Sess. (Mar. 12, 1991) (the statute is needed because "sex offenders [are] very difficult to rehabilitate ... the level of success with sex offenders is not good") (testimony of Sen. Maxson).

[¶ 60] Both statutes were also clearly intended to be a part of the criminal code, as the obligation to register arose only in the context of having been convicted of certain crimes.

[¶ 61] Concern over the confidentiality of an offender's registration information and the inherent confusion resulting from two registration statutes led to changes in 1993. *See Hearing on S.B.2042 Before Judiciary Committee*, 53rd N.D. Legis. Sess. (Feb. 15, 1993)(testimony of Ross Keller, Legislative Council). The statutes were consolidated in N.D.C.C. § 12.1–32–15 (1993). Placing the sexual offender registration within the provisions of § 12.1–32–15 was a clear structural acknowledgment that its function was a part of chapter 12.1–32, Penalties and Sentencing. The confidentiality provision was eliminated so that an offender's registration information would be "open to inspection by the public." N.D.C.C. § 12.1–32–15(8) (1993). Violations of N.D.C.C. ch. 12.1–20, sex offenses, were dropped from the definition of "a crime against a child" to clear any confusion as to whether registration requirements for offenders committing a crime against children were mandatory or discretionary. Thus, "sexual offenders" were required to register regardless of the victim's age, while registration for those convicted of other "crimes against a child" was still discretionary with the court. N.D.C.C. § 12.1–32–15(2) (1993).[13]

[¶ 62] In 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, 42 U.S.C. §§ 14071(a)-(f) (the "Wetterling Act"). The Wetterling Act initially conditioned the availability of federal crime prevention funds upon a state's enactment of laws requiring individuals convicted of sexually violent offenses or crimes against children to register with state law enforcement agencies. 42 U.S.C. § 14071(a) and (f) (1995). Also initially, the Wetterling Act permitted law enforcement authorities to release certain information only under limited circumstances. 42 U.S.C. § 14071(d). In 1996, however, Congress amended the Wetterling Act, adding a mandatory notification provision in certain circumstances to the existing registration requirements.[14]

[¶ 63] Responding to the 1994 Wetterling Act, the 1995 legislature again amended N.D.C.C. § 12.1–32–15. In conformance with the federal amendments to the notification requirements, the 1995 legislature added subsection 10 which provided in part:

10. Relevant and necessary registration information may be disclosed to the

---

13. The remedial purpose of the statute was emphasized again during the legislative hearings on the proposed changes to N.D.C.C. § 12.1–32–15. *See Hearing on S.B.2042 Before Senate Judiciary Committee*, 53rd N.D. Legis. Sess. (Jan. 13, 1993) (responding to concerns about the registry's lack of confidentiality, Assistant Attorney General Vukelic said, "the response to this concern [is] that this is primarily an investigative tool, something that would assist local law enforcement and the Bureau of Criminal Investigation when an act of violence or sexual assault had been committed against a child.").

14. *See* 42 U.S.C. § 14071(d) (1996) which provided:
 (d) Release of information
 (1) The information collected under a State registration program may be disclosed for any purpose permitted under the laws of the State.
 (2) The State or any agency authorized by the State shall release relevant information that is necessary to protect the public concerning a specific person required to register under this section, except that the identity of a victim of an offense that requires registration under this section shall not be released.

public by a law enforcement agency if the agency determines that the individual registered under this section is a public risk and disclosure of the registration information is necessary for public protection. The department, in a timely manner, shall provide law enforcement agencies any information the department determines is relevant concerning individuals required to be registered under this section who are about to be released or placed into the community.

This first part of subsection 10 mirrors the federal notification provision in 42 U.S.C. § 14071(d) (1995). *See* n.8, *supra.* Although not a part of the federal law, the legislature broadened the notification provision in the second half of subsection 10:

Nonregistration information concerning an offender required to register under this section consisting of the name of the offender, the last known address of the offender, the offense or offenses as defined in subsection 1 to which the offender pled guilty or of which the offender was found guilty, the date of the judgment or order imposing a sentence or probation and the court entering the judgment or order, the sentence or probation imposed upon the offender, and any disposition, if known, of a sentence or probation may be disclosed to the public. The attorney general shall compile nonregistration information concerning offenders required to register under this section from criminal history record information maintained pursuant to chapter 12–60 or from an agency or department of another state or the federal government and shall provide the information upon request at no cost.

N.D.C.C. § 12.1–32–15(10) (1995). The legislature also immunized law enforcement and related agencies from civil liability with respect to disclosure of registry information. *Id.* ("A law enforcement agency, its officials, and its employees are not subject to civil or criminal liability for disclosing or for failing to disclose information as permitted by this section.").

[¶ 64] The 1995 legislature also broadened the registration requirements to include any person who:

a. Is incarcerated or is on probation or parole on August 1, 1995, for a crime against a child or as a sexual offender;

b. Has pled guilty or nolo contendere to, or been found guilty of, an offense in a court of another state or the federal government equivalent to those offenses set forth in subdivisions a and c of subsection 1; or

c. Has pled guilty to or been found guilty of a crime against a child or as a sexual offender within ten years prior to August 1, 1995.

N.D.C.C. § 12.1–32–15(2)(a)–(c) (1995).[15] While the legislature chose to give the registration requirement retroactive effect, the Wetterling Act does not require states to apply their registration and notification laws retroactively.

[¶ 65] As the majority points out, the scant legislative history dealing with subsections 2 and 10, N.D.C.C. § 12.1–32–15 (1995), suggests a remedial intent. The only person to give testimony on the pertinent amendments, Assistant Attorney General Robert Bennet, opined the amendments were "not imposed for punishment purposes, but, rather, for regulation of the offenders required to register ... and to protect the health, safety, and welfare of the members of the local community and citizens of this state." *Hearing on H.B. 1152 Before the House Judiciary Committee*, 54th N.D. Legis. Sess. (Jan. 9, 1995).

[¶ 66] Our legislature did not state its intent when amending § 12.1–32–15 in 1995. Where, however, a legislature does expressly state its intent and the stated intent is remedial, the inquiry does not end. The legislature of Pennsylvania set forth a "Declaration of policy" when it enacted its sexually violent predator act. Nevertheless, the Supreme Court of Penn-

---

**15.** In 1997, these subsections were renumber- ed § 12.1–32–15(3)(a)–(c).

sylvania struck down portions of the law as being violative of the due process clause of the Fourteenth Amendment, stating: "despite the fact that the legislature intended that the Act serve as 'a means of assuring public protection,' by increasing the punishment for the listed predicate offenses where the offender is determined to be a sexually violent predator, the goals of the sexually violent predator provisions are equally punitive." *Commonwealth of Pennsylvania v. Williams,* —— Pa. ——, 733 A.2d 593, 601 (1999). While one non-legislator proponent continued to recite the benign purposes of § 12.1–32–15, the 1995 changes affirmatively establish the statute to be punitive and, therefore, violative of the ex post facto clauses. These changes retroactively brought Burr under the mandate of the statute while, at the same time, broadening the notification provisions and creating immunity for those who disclose information.

[¶ 67] The 1997 legislature changed subsection 10, recodified as subsection 11, to make mandatory, rather than permissive, the notification provisions of the first sentence of the subsection. Burr was charged under the 1997 statute.

### 2. Effects of Legislation

[¶ 68] Where a legislature expressly declares a regulatory purpose or where there is no express legislative intent, the analysis turns to the second prong of the intents-effects test. This part of the test requires an analysis of the statute's effects in light of the challenger's heavy burden. *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072; *Ursery,* 518 U.S. at 290, 116 S.Ct. 2135.

[¶ 69] I agree with the majority that the *registration* requirements of N.D.C.C. § 12.1–32–15 do not implicate ex post facto concerns.[16] The majority errs in this case, however, when it fails to analyze both the registration and notification provisions of

N.D.C.C. § 12.1–32–15. Although the majority, at ¶ 29, would ignore the provisions of subsection 11 to reach its result, all persons required to register under N.D.C.C. § 12.1–32–15 are subject to the notification provision of subsection 11. Its provisions are, therefore, a necessary consequence of registration under subsection 3(c). For the reasons discussed below, I find the notification provision found in N.D.C.C. § 12.1–32–15(11) (1997) to effectively impose punishment on those retroactively subject to the registration requirement under N.D.C.C. § 12.1–32–15(3)(c), thereby violating the ex post facto clause.

[¶ 70] The Supreme Court has not outlined the precise nature of the second-stage inquiry in which the challenger must overcome a presumption that the statute is not punitive by establishing with the "clearest proof" that the sanction, in form and operation, is punitive in nature. Analyzing whether a purportedly civil statutory scheme is effectively criminal or punitive, the Court continues to acknowledge the utility of the *Mendoza–Martinez* factors, while holding these factors are neither exhaustive nor dispositive. *Ursery,* 518 U.S. at 278, 116 S.Ct. 2135; *Ward,* 448 U.S. at 249, 100 S.Ct. 2636 (these factors are "certainly neither exhaustive nor dispositive, [but have] proved helpful in our own consideration of similar questions and provide some guidance in the present case") (citation omitted). The *Mendoza–Martinez* factors are useful guideposts in this inquiry; however, because the Court has failed to give any indication of the "weight and priority" of each factor, the test poses the risk of "unmanageable indefiniteness." *Opinion of the Justices,* 423 Mass. 1201, 668 N.E.2d 738, 750 (1996). Thus, the factors should not be applied as a "pass/fail test or in a checklist fashion ... some add little, if anything, to the analysis, while others provide significant

---

**16.** In *Commonwealth of Pennsylvania v. Gaffney,* 733 A.2d 616, the Supreme Court of Pennsylvania held its sexual offender registration act does not violate state and federal ex post facto clauses. In its opinion the court stated "we wish to make clear that only the registration provisions of the Act are at issue here," *id.* at 618 n. 6, and the Court stressed the registry information "is not disseminated to the public." *Id.* at 621.

guidance." *State v. Myers*, 260 Kan. 669, 923 P.2d 1024, 1040 (1996). *Ursery* also implies that the *Mendoza–Martinez* factors "may not be transformed into a rigid series of hurdles which must be surmounted, one after the other, before the legislation can survive an *ex post facto* or double jeopardy challenge." *W.P. v. Poritz*, 931 F.Supp. 1199, 1209 (D.N.J.1996).

[¶ 71] Accordingly, in analyzing whether the notification provision of N.D.C.C. § 12.1–32–15 constitutes impermissible "punishment," we should weigh and evaluate the *Mendoza–Martinez* factors most relevant to the effects of the statute in this case.

[¶ 72] The dispositive factor in this case asks whether the notification requirement is "excessive in relation to its remedial purpose." *Mendoza–Martinez*, 372 U.S. at 169, 83 S.Ct. 554. This factor requires public disclosure or community notification provisions to be reasonably related or tailored to the statute's remedial, nonpunitive purpose. *E.g., E.B. v. Verniero*, 119 F.3d 1077, 1097–98 (3rd Cir.1997).

[¶ 73] There have been several challenges to the "excessiveness" of community notification provisions. While a majority of the notification provisions have been upheld, several have been invalidated because the statute was not "reasonably" tailored to the statute's remedial purpose. An analysis of those cases which have invalidated notification provisions demonstrates the "excessiveness," and therefore punitive effect, of N.D.C.C. § 12.1–32–15.

[¶ 74] The Kansas Supreme Court in *State v. Myers*, 260 Kan. 669, 923 P.2d 1024 (1996), addressed the constitutionality of a community notification provision similar to North Dakota's. The Kansas sex offender registration statute, though not imposing any affirmative dissemination requirements on authorities, imposed no restrictions on anyone who requested or inspected the registry information. *Id.* at 1041 (citing K.S.A. § 22–4909). As a result, "[t]he information could be routinely published in the newspaper or otherwise

voluntarily disseminated by anyone … [or][t]he print or broadcast media could make it a practice of publishing the list as often as they chose." *Id.* The effect of such widespread and unrestricted dissemination, the court reasoned, could subject all offenders to "public stigma and ostracism" or make it impossible for him or her to find housing or employment. *Id.*

[¶ 75] The *Myers* court not only found the registry's public access to be overly broad, it also viewed the statute's expansive list of sex crimes as undermining its expressed remedial goals. Included in the statute were several sex crimes which otherwise might be viewed as voluntary sexual contact between two persons and considered criminal only because of the minority status of the victim or the marital status of the parties. 923 P.2d at 1042. The court questioned whether the statute's remedial purpose was necessarily being served with such an over-inclusive list of sex crimes which labeled offenders of some relatively minor crimes as "sex offenders" and potentially subjected them to unlimited public access. *Id.* at 1042–43.

[¶ 76] The *Myers* court upheld the registration portion of the statute; however, to avoid an ex post facto violation, the court held that offenders required to register for crimes committed prior to the statute's effective date would not be subject either to the public inspection provisions or the Kansas Open Records Act. 923 P.2d at 1043. Focusing on the excessiveness of the notification provision, the court concluded:

> For Myers, [the] disclosure provision must be considered punishment. We hold that the legislative aim in the disclosure provision was not to punish and that retribution was not an intended purpose. However, we reason that the repercussions, despite how they may be justified, are great enough under the facts of this case to be considered punishment. The unrestricted public access given to the sex offender registry is

excessive and goes beyond that necessary to promote public safety ... [and therefore] violates the constitutional prohibition against ex post facto laws. We emphasize we are not balancing the rights of Myers or other sex offenders against the rights of his or their victims. What we are addressing is the right of every citizen, in this case, Myers, to test a claim of constitutional infringement arising from retroactive legislation. Regardless of legislative motivation, we have a duty to entertain such a claim when asserted and to resolve the tension between the positions of Myers and the State.

... To avoid the ex post facto characterization, public access should be limited to those with a need to know the information for public safety purposes. This information should be used by those given access to it only for such purposes. As the law is written now, no such measures are in place for Myers.

*Id.* at 1043.

[¶ 77] The Massachusetts Supreme Court addressed the constitutionality of one of two notification provisions in that state's sex offender registration statutes in *Doe v. Attorney General,* 425 Mass. 217, 680 N.E.2d 97 (1997). The notification provision at issue provided in part:

Any person who is eighteen years of age or older, upon the verification of his age and identity, shall receive at no cost from the [criminal history systems board] a report which indicates whether an individual identified by name, date of birth or sufficient personal identifying characteristics is a sex offender, ... the offenses for which he or she was convicted or adjudicated, and the dates of said convictions or adjudications.

General Laws c. 6, § 178I (1996). The court interpreted the provision to effectively allow "[a]ny adult, merely by presenting identification, [to] obtain sex offender registry information from the board for any reason or for no reason at all." 680 N.E.2d at 99. The court reasoned:

The board's disclosures under § 178I are not limited to serving some worthy public purpose.... The possibility exists ... that a person with no remedial motive will obtain sex offender registry information and reveal it to the plaintiff's detriment. The potential harm to the plaintiff in his employment or in his community, or both, from the use of such information for other than personal protection is substantial. Once the plaintiff is harmed, at best it will not easily be remediable.

*Id.* at 99–100. The court concluded application of § 178I to the challenger, who had been convicted of open and gross lewdness prior to its enactment, effectively imposed "punishment" and thus violated ex post facto restrictions. Reasoning there would be no "apparent remedial purpose to be served by the general availability of information pursuant to § 178I," the court upheld the trial court's preliminary injunction enjoining enforcement of § 178I. *Id.* at 100.

[¶ 78] A federal district court recently addressed the constitutionality of Utah's sex offender registration statute's notification provision. *See Femedeer v. Haun,* 35 F.Supp.2d 852 (D.Utah 1999). In 1998, the Utah Legislature amended its sex offender registration statute by removing its restriction against retroactive application and allowing registry information to be available to the public without restriction. *Id.* at 854. The State intended to make registry information available to the public without restriction via an Internet website. *Id.* at 854–55.

[¶ 79] The defendant, who committed a sex crime prior to the amendment's effective date, argued the law violated, among other things, the ex post facto clause. He argued the notification provision was excessive because it failed to provide a risk assessment or alternative moderating procedure which related the degree of public notification to the offender's risk of reoffense. *Haun,* 35 F.Supp.2d at 858. The

*Haun* court determined a risk assessment procedure was not constitutionally required, although it observed "most, if not all other, sex offender registration and notification statutes" contain risk assessment or other moderating procedures. *Id.* at 858–59. The court further observed:

> This Court is not aware of any sex offender registration and notification acts that have passed constitutional muster that do not contain procedural safeguards designed to ensure that the burden imposed on registrants does not exceed the burden inherent in accomplishment of such acts' goals.

*Id.* at 859 (citations omitted).

[¶ 80] Prior to the 1998 amendments, Utah's sex offender registration statute specifically directed the Department of Corrections to "establish security systems to ensure that only [those authorized by statute to receive registry information] may gain access to information" and enact regulations to instruct recipients of registry information concerning its appropriate use. *Haun*, 35 F.Supp.2d at 859 (citing Utah Code. Ann. § 77–27–21.5(2)(c) and 18(c) (1996 Supp.)). The court concluded although it was not its prerogative to dictate the form safeguards must take, "to the extent the statute is to be applied retroactively, they are constitutionally required." *Id.* The court held the 1998 notification amendments, as applied to offenders who completed all the terms of their sentence or probation prior to the amendment's effective date, violated the ex post facto clause "insofar as the statute fails to limit the extent of disclosure to the degree necessary to accomplish the statute's non-punitive goals of assisting in the investigation of sex-related crimes, apprehending

offenders, and providing registry information to the possible victims of recidivist offenders." *Id.*

[¶ 81] The conclusion to be drawn from these cases is that a notification provision risks being "punitive" and therefore unconstitutional if it: provides unrestricted availability of registry information to the public, lacks restrictions as to what and where the information can be disseminated, or establishes an overly inclusive list of crimes triggering the registration requirements. The infirmities identified in these cases are all apparent in N.D.C.C. § 12.1–32–15 (1997).

[¶ 82] On the other hand, cases rejecting ex post fact challenges to community notification provisions have generally done so because the particular statute has tailored the extent of public notification or dissemination to the offender's risk of re-offense and danger to the public.[17] In *Doe v. Pataki*, 120 F.3d 1263, 1281–82 (2nd Cir. 1997), the court rejected a challenger's argument that the excessive sweep of New York's sexual offender notification provisions evidenced the registration statute's punitive effect.

[¶ 83] The court concluded, while the law covered a number of offenses "that appear to present a far less compelling need for community notification than offenses like child molestation," the law was not excessively broad so as to constitute punishment because it contained "a number of moderating provisions capable of greatly limiting the extent of notification or even of relieving the offender from notification altogether." *Doe v. Pataki*, 120 F.3d at 1282. For instance, the registration law called for a risk assessment based on objective criteria, all of which were relevant to the de-

---

**17.** For instance, many states employ risk assessment systems to better serve the statute's remedial goals. Under such a system, the level of notification permitted or required relates to the level of risk the individual offender poses to the public. Risk determinations are commonly made by an independent hearing board or the court, and are based on a series of objective factors. Typically, registra-

tion information concerning low or no risk offenders is subject to the narrowest range of disclosure, if at all. *See generally Verniero*, 119 F.3d at 1083–85 (discussing New Jersey's public notification and risk assessment procedures); *Haun*, 35 F.Supp.2d at 858–59 (discussing risk assessment procedures in Utah's sexual offender registration statute).

gree of risk presented by each registrant. *Id.* (citing N.Y. Correct. Law § 168-l(5)). Moreover, low risk and first time offenders were allowed to petition the court to be relieved of the registration requirements, and in the event they were not relieved of the requirements, the extent of notification was extremely limited. *Id.* (citing N.Y. Correct. Law §§ 168-l(6)(a), 168-p and – o). Because the court concluded the notification provisions contained procedures which carefully tailored the amount of information accessible and the recipients to whom registry information could be disseminated based upon the offender's risk of reoffense, it held "the legislature acted well within its authority in determining the kind of offenses triggering notification, the category of persons subject to the Act's requirements, and the extent of notification appropriate to promote its nonpunitive goals." *Id.* at 1282–83.

[¶ 84] The Third Circuit Court of Appeals similarly held New Jersey's public notification provisions were not excessive in relation to the statute's remedial goals under the ex post facto and double jeopardy clauses. *See Verniero*, 119 F.3d at 1098–99. Like New York's notification provisions, New Jersey's sex offender registration scheme provided a tiered risk assessment procedure which attempted to tie the degree of disclosure to the degree of the offender's risk of reoffense or danger to the public. *See id.* at 1083–84 (discussing New Jersey's tiered notification scheme). The *Verniero* court concluded · the dissemination of registry information beyond law enforcement agencies was reasonably related to the statute's nonpunitive goals:

> [T]hese goals have not been pursued in a way that has imposed a burden on registrants that clearly exceeds the burden inherent in accomplishment of the goals. The statutory scheme is a measured response to the identified problem that does not subject all registrants to dissemination of information beyond law enforcement personnel. The Guidelines

call for a risk assessment based on objective criteria, all of which might reasonably be perceived as relevant to the degree of risk presented by each registrant. This risk assessment is utilized to determine the maximum scope of the notification concerning the registrant.

*Id.* at 1098.

[¶ 85] Although a tiered risk assessment scheme may protect a statute from ex post facto challenge, it is not a constitutional imperative for the retroactive application of a sex offender registration law. Other restrictions may provide constitutional footing, and a number of cases have upheld notification provisions that lacked such a procedure. In *State v. Noble*, 171 Ariz. 171, 829 P.2d 1217, 1224 (Ariz.1992), the Arizona Supreme Court held, on balance, Arizona's sex offender registration statute was not punitive. The majority cites *Noble* to support its conclusion N.D.C.C. § 12.1–32–15 is "not excessive in relation to the important regulatory purpose served." ¶¶ 23, 24. However, the *Noble* court's rationale in concluding Arizona's statute was not "excessive" in relation to its nonpunitive purpose supports, I believe, the conclusion the public notification provision in N.D.C.C. § 12.1–32–15 (1997) is punitive.

[¶ 86] The Arizona registration provision allowed for the release of registry information to:

> noncriminal justice agencies for evaluating prospective employees, public officials, or volunteers; governmental licensing agencies for evaluating prospective licensees; prospective employers and volunteer youth-service agencies whose activities involve regular contact with minors; and the department of economic security and the superior court for determining the fitness of prospective custodians of juveniles.

*See Noble* at 1222 n. 8 (summarizing A.R.S. § 41–1750(B)(8), (9), (11), (13) (1991)). Although the "decision [was] close," the court reasoned "the provisions

in the statute limiting access to the registration information significantly dampen [the registration's] stigmatic effect." *Id.* at 1223. Arizona's limitation on access to registry information starkly distinguishes that state's statutory scheme from the law applied to Burr. The North Dakota statute provides no limitation on disseminating registry information.

[¶ 87] The *Noble* court acknowledged the lower court's conclusion that the scope of the registration requirement was excessive because it applied to anyone convicted of any sex offense, including cohabitation, adultery, and lewd and lascivious conduct. However, it decided not to address whether registration would "constitute punishment if applied to offenders convicted of other offenses for which the threat of recidivism may possibly be less significant or for which registration may have no valid regulatory purpose." *Id.* at 1224. Rather, because the challenger was a convicted child molester, the court framed its issue more narrowly, concluding "the registration requirement, as applied to child sex offenders, is not excessive in relation to its non-punitive, law enforcement purpose." *Id.* The Kansas Supreme Court was correct when it concluded "*Noble* implies that if disclosure of the information had not been statutorily limited, it would be regarded as the kind of affirmative disability or restraint usually associated with criminal punishment." *Myers,* 923 P.2d at 1037.

[¶ 88] The majority also cites *State v. Ward,* 123 Wash.2d 488, 869 P.2d 1062, 1076 (1994), to support its conclusion our registration statute is not excessive. Again, the difference between Washington's statute and our own does not support the analogy the majority makes. In *Ward,* the Washington Supreme Court addressed the disclosure limits on Washington's sexual predator registration statute, which at that time provided: "[p]ublic agencies are authorized to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection." RCW 4.24.550(1) (1993).

[¶ 89] Acknowledging Washington's notification provision was broader than that analyzed in *Noble,* the *Ward* court nonetheless concluded the requirements were sufficiently tailored to serve the statute's nonpunitive goals. *Id.* at 1071. The court found a number of implicit limits in the statute, construing the notification provision as requiring a public agency to "have some evidence of an offender's future dangerousness, likelihood of reoffense, or threat to the community, to justify disclosure to the public in a given case ... [which] ensures that disclosure occurs to prevent future harm, not to punish past offenses." 869 P.2d at 1070. The court found two other implicit limits on disclosure: only information "necessary to counteract the danger created by the particular offender" could be disseminated, and only within geographical boundaries commensurate with the risk to the public. *Id.* at 1070–71.[18] Moreover, the statute only required registration of felony sex offenders, and all offenders were allowed to petition the court to be relieved of the registration requirement by showing their registration would not serve the remedial purposes of the statute. *Id.* at 1074 (citing RCW 9A.44.140(2)). Finding sufficient restraints on the disclosure of registry information, the *Ward* court concluded "the statutory limits on disclosure ensure that the potential burdens placed on registered offenders fit the threat posed to public safety." *Id.* at 1071. Contrary to the majority, I read *Ward* to imply had Washington's notification provision not con-

18. The State of Washington has since amended its notification provisions to codify the restraints judicially imposed by the court in *Ward. See* RCW 4.24.550(2) (1999). Notably, Washington now also requires the government agency to make a risk assessment and categorize the offender in one of three risk levels. The risk level then dictates the medium, amount, and audience to which the offender's registration may be disseminated. RCW 4.24.550(3)-(4) (1999).

tained these various restraints, most of which N.D.C.C. § 12.1–32–15(11) does not contain, the provision would have been deemed excessive and in effect imposed punishment.[19]

[¶ 90] The notification provisions surviving ex post facto challenges generally contain certain procedures or constraints which more closely tailor the extent of any public notification to the offender's risk of reoffense or danger to the public. In the absence of such procedures, notification provisions may still withstand a constitutional challenge if the list of crimes subject to notification is directly related to the degree of risk to the public. Again, N.D.C.C. § 12.1–32–15 fails on both accounts.

[¶ 91] The first part of N.D.C.C. § 12.1–32–15(11) (1997) has nearly identical language to the notification provision analyzed in *Ward*.[20] Thus, law enforcement in this state must release relevant and necessary registration information when it is determined the offender poses a public risk and dissemination is necessary for the public's protection. Presumably this portion of N.D.C.C. § 12.1–32–15(11) contains the institutional constraints implicitly found by the court in *Ward*, 869 P.2d at

1070–71. *See supra* ¶¶ 50, 51 (discussing *Ward*). This apparent constraint, however, is largely diminished since, unlike many other states' notification provisions, our statute eliminates any accountability to those who may disseminate a registrant's information. N.D.C.C. § 12.1–32–15(11) ("A law enforcement agency, its officials, and its employees are not subject to civil or criminal liability for disclosing or for failing to disclose information as permitted by this section.").

[¶ 92] While there are apparent constraints as to whom and what information law enforcement may disseminate, the statute goes on to provide the registry information is completely accessible to the general public without regard to the offender's underlying offense or potential risk of re-offense. *See id.* ("Nonregistration information[21] . . . may be disclosed to the public. The attorney general shall compile nonregistration information . . . and shall provide the information upon request at no cost."). Thus, much like the Massachusetts notification provision previously discussed, under the law applicable to Burr "[t]he possibility exists . . . that a person with no remedial motive will obtain sex offender registry information and re-

19. The majority also relies on *State v. Manning*, 532 N.W.2d 244, 247–48 (Minn.Ct.App. 1995), *People v. Adams*, 144 Ill.2d 381, 163 Ill.Dec. 483, 581 N.E.2d 637, 640 (1991), and *People v. Starnes*, 273 Ill.App.3d 911, 210 Ill. Dec. 417, 653 N.E.2d 4, 7 (1995), to support its conclusion N.D.C.C. § 12.1–32–15 does not violate the ex post facto clause. Indeed all three cases held the sex offender registration statutes at issue did not constitute "punishment" in a constitutional sense. Unlike our statute, however, the Minnesota statute at issue in *Manning* allowed registry information only to be used "for law enforcement purposes," *see* Minn.Stat. § 243.166 (1992 & 1993 Supps.), and the Illinois statute at issue in *Adams* and *Starnes* required child sex offender registration information to be held in confidence by law enforcement, and the unauthorized release of supplied information was a class B misdemeanor, *see* Ill.Rev.Stat.1987, ch. 38, para. 229. These statutes contain significant constraints on notification which are absent from N.D.C.C. § 12.1–32–15.

20. N.D.C.C. § 12.1–32–15(11) provides in pertinent part: "Relevant and necessary registration information shall be disclosed to the public by a law enforcement agency if the agency determines that the individual registered under this section is a public risk and disclosure of the registration information is necessary for public protection." The provision at issue in *Ward* provided: "[p]ublic agencies are authorized to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection." RCW 4.24.550(1) (1993).

21. Nonregistration information consists of "the name of the offender, the last known address of the offender, the offense or offenses as defined in subsection 1 to which the offender pled guilty or of which the offender was found guilty, the date of the judgment or order imposing a sentence or probation . . . imposed upon the offender, and any disposition, if known, of a sentence or probation. . . ." N.D.C.C. § 12.1–32–15(11) (1997).

veal it to the plaintiff's detriment." [22] *Doe v. Attorney General*, 680 N.E.2d at 100 (upholding injunction enjoining enforcement of notification provision which allowed any adult to receive registry information simply by identifying an offender by name, date of birth or sufficient personal identifying characteristics).

[¶ 93] The Pennsylvania Supreme Court recently stated "[o]ne's livelihood, domestic tranquility and personal relationships are unquestionably put in jeopardy by the notification provisions." *Williams*, at 606 (holding the sexually violent predator provisions of Pennsylvania's Megan's Law to be violative of due process guarantees of the Fourteenth Amendment). It is because "the state has no substantial interest in notifying persons who will not come into contact with the registrant," *Verniero*, 119 F.3d at 1107–08, that the public's access to registry information "should be limited to those with a need to know the information for public safety purposes ... [and] should be used by those given access to it only for such purposes." *Myers*, 923 P.2d at 1043.

[¶ 94] While the statute's constraints on law enforcement's ability to disseminate registry information fairly balances an offender's right to privacy with the remedial goals of the statute, the unrestricted public access provision is excessive and goes beyond what is necessary to promote public safety. This is especially true when one considers the over-inclusive list of crimes which trigger the registration requirement under § 12.1–32–15.

[¶ 95] An overly broad inclusion of crimes which require registration indicates the statute is punitive, rather than remedial, because such a broad sweep undermines, rather than promotes, goals of assisting investigations and preventing re-

offenses. *Myers*, 923 P.2d at 1042. Section 12.1–32–15 has such a broad reach. Under the 1997 statute, the definition of "a crime against a child" subjected offenders of several non-sexual and/or misdemeanor offenses to the registration and notification requirements of the statute.

[¶ 96] The problem with this over-inclusiveness was aptly summarized by Assistant Morton County State's Attorney, Ladd Erickson, when he testified in support of Senate Bill 2299 [23] during the 1999 Legislative session:

> Serious problems have developed with the existing registration law [which] are undermining the important purposes of the registration program. Currently, many offenses that have nothing whatsoever to do with the purposes of the registration program such as playground fights (simple assault) between juveniles, or young adults and juveniles, where the underlying motive is unrelated to do sexual deviance or victimization are forced to register. In addition, consensual sexual relations between mature juveniles, and mature juveniles and young adults, are required to register as offenders.
>
> The problems with registering these types of offenses start with the realization that people that are not dangerous to society are unjustly labeled as perverts, pedophiles, rapists, or predators. While a law enforcement officer knows these people are not a danger the public does not, and a citizen that looks at the offender list cannot make a distinction between a sexual predator and a young adult who had a consensual sexual relationship with a girlfriend that is a few

**22.** In North Dakota this possibility became a reality when, in January 1999, a citizen broadcast over a Grand Forks radio station a list obtained from the Attorney General's office which contained names of 52 persons who registered as sex offenders in Grand Forks County. *See* Mike Jacobs, *Withholding Information Sometimes Makes Sense for News-* *papers*, Grand Forks Herald, Jan. 31, 1999 at B1.

**23.** Senate Bill 2299 narrowed the scope of N.D.C.C. § 12.1–32–15 registration and notification requirements. My conclusions in this opinion apply only to the law as it applied to Burr.

months or years younger than the "offender."

. . . .

Currently, approximately half of the registered crimes on the juvenile offender database are simple assault "playground" type fights. This is strong evidence alone of how far afield the current registration law has gotten from the intent of the Wetterling Act. . . . These people being placed on a list serves no public or law enforcement function and dilutes the significance of the offenders on the registration list as people that may be a danger to society. . . .

Under the current system, detectives have to swim through all of the listed offenders attempting to find people that may be suspects. All these minor offense registrations hamper investigations, and can endanger the victims as detectives try to find offenders that match the profile of the crime.

*See Hearing on S.B. 2299 Before the Senate Judiciary Committee*, 56th N.D. Legis. Sess. (Jan. 25, 1999).

[¶ 97] The Erickson testimony underscores one of the constitutional defects of N.D.C.C. § 12.1–32–15 (1997): Because of the overly inclusive list of triggering crimes, several individuals who pose a marginal risk or no risk of committing later sex crimes or crimes against children will be labeled for ten years as "sex offenders" on a list subject to unfettered public inspection and dissemination. This over-inclusiveness, coupled with the statute's lack of standards for determining whether (and to what extent) an offender's registry information may be made available to the public, creates consequences severe enough to be considered punishment.

III. Conclusion

[¶ 98] The fact that § 12.1–32–15 serves to punish sexual offenders is a matter of legislative policy and a good policy too, in my opinion, as to persons who come within its scope after its enactment. As to Burr,

however, the statute violates both federal and state ex post facto restrictions. In the end, I hark back to the test applied by the territorial court in *Miller* and by this court in *Rooney,* and measure the law by its effect. I ask: does the statute impose more punishment on Burr for his crime than was authorized at the time he committed the crime? It does. Burr had fully served his sentence, completed his probation and been released from supervision before § 12.1–32–15 swept him under its reach. If the ex post facto clauses of the state and federal constitutions are not violated in this circumstance, then those "constitutional bulwarks" are not true fortifications that protect personal liberty from the power of government. They are ephemeral barriers that dissolve whenever the state enacts new means to protect society regardless of the punitive and retroactive effect of those means. I do not read either the state or federal constitutional provision to be so insubstantial. Therefore, I dissent.

[¶ 99] MARY MUEHLEN MARING, J., concurs.