UNITED STATES of America,
Plaintiff,

v.

Paul SCZUBELEK, Defendant.

No. CRIM.A.94–8–SLR.

United States District Court,
D. Delaware.

April 2, 2003.

Colm F. Connolly, United States Attorney, and Adam Safwat, Assistant United States Attorney, United States Attorney's Office, District of Delaware, Wilmington, Delaware. Counsel for Plaintiff.

Eleni Kousoulis, Esquire, Assistant Federal Public Defender, Federal Public Defender's Office, Wilmington, Delaware. Counsel for Defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

On June 17, 1994, a federal jury found defendant guilty on three counts of bank robbery pursuant to 18 U.S.C. § 2113(a) and one count of structuring cash transactions under 31 U.S.C. §§ 5324(3), 5322(a). (D.I.55) Defendant was sentenced to 87 months of imprisonment on the bank robbery convictions and 60 months on the cash transaction conviction, all to be served concurrently. (D.I.156) Defendant was ordered to serve a three-year term of supervised release upon release from imprisonment.[1] Defendant was released from prison in August 2000 and placed on home confinement. In October 2000, his three-year period of supervised release commenced. (D.I.188)

After serving approximately two years of supervised release, a United States probation officer notified defendant by telephone that he was scheduled for a DNA[2] collection on September 25, 2002, pursuant to the DNA Analysis Elimination Act, 42 U.S.C. §§ 14135–14135e (2001 Supp.).[3] Defendant did not appear at this appoint-

---

1. 18 U.S.C. § 3583.

2. Deoxyribonucleic acid. An individual's DNA is the same in every cell in the body and remains unchanged throughout life. *See* Thomas M. Fleming, Annotation, *Admissibility of DNA Identification Evidence*, 84 A.L.R.4th 313 at § 2(b)(1991). With the exception of identical twins, no two persons have the same DNA.

3. The date of the call is not reflected in the record. (D.I.216, Ex. D)

ment, asserting through his counsel that the DNA testing requirement is unconstitutional as applied to him. (D.I.206)

As a result, a petition for violation of a mandatory condition of supervised release was filed against defendant on October 1, 2002. (D.I.206) On October 15, 2002, the court ordered defendant to appear to answer the charges (D.I.206), and a hearing was scheduled for November 22, 2002. After the parties jointly requested pre-hearing briefing due to the complexity of the constitutional issues implicated, the court adjourned the revocation hearing. (D.I. 211) Both sides then submitted briefs (D.I. 214, 215, 216, 217, 220), and oral argument was conducted on February 11, 2003. The court has jurisdiction pursuant to 18 U.S.C. § 3231. *See* 18 U.S.C. § 3583(e)(3) (court's authority to revoke supervised release under certain circumstances). For the reasons that follow, the court finds that requiring defendant to submit to a DNA sampling does not violate his Fourth Amendment right against unreasonable searches and seizures.

## II. BACKGROUND

In December 2000, the United States Congress enacted the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. § 14135 (the "DNA Act"). The DNA Act[4] requires United States probation offices to collect a DNA sample from each individual being supervised while on probation, parole or supervised release who has been convicted of a qualifying federal offense. 42 U.S.C. § 14135a(a)(2). A "DNA sample" is defined as "tissue, fluid or other bodily sample of an individual on which a DNA analysis can be carried out." 42

U.S.C. § 14135c. "Qualifying federal offenses" are violent crimes, including homicides, sex offenses, kidnaping, robbery[5] and conspiracies to commit these offenses. 42 U.S.C. § 14135a(d). With the passage of the DNA Act, Congress amended the supervised release statute, 18 U.S.C. § 3583, *to expressly require DNA collection:* "[T]he court shall order, as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is authorized pursuant to the DNA [Act]."

The penalty for failure to cooperate in the collection of a DNA sample is a class C misdemeanor offense, punishable by up to one year in custody and a fine of up to $100,000. 42 U.S.C. § 14135a(a)(5). Failure to comply may also result in the filing of supervised release violation charges by a probation officer. The Probation Office is authorized to "use reasonable means to detain, restrain, and collect samples from a person who refuses to give a sample voluntarily." 42 U.S.C. § 14135a(a)(4)(A).

Once a sample is collected, the Probation Office sends the sample to the Federal Bureau of Investigation ("FBI") for entry into the Combined DNA Index System ("CODIS"), a national DNA database linking DNA evidence in a nationwide computer network. 42 U.S.C. § 14135a(b). "CODIS is a national index of DNA samples taken from convicted offenders, crime scenes and victims of crime, and unidentified human remains that 'enables law enforcement officials to link DNA evidence found at a crime scene with a suspect whose DNA is already on file.'" *United*

---

4. The DNA Act also mandates that the director of the Bureau of Prisons ("BOP") collect a DNA sample from each individual in custody of the BOP who is or has been convicted of a qualifying federal offense. 42 U.S.C. § 14135a(a)(1). The BOP may use any means reasonably necessary to compel a per-

son who refuses to cooperate with the collection, and that noncooperating person may be subject to criminal penalty. 42 U.S.C. §§ 14135a(a)(4)-(5).

5. Armed bank robbery, 18 U.S.C. § 2113, is a qualifying federal offense.

*States v. Miles,* 228 F.Supp.2d 1130, 1132 (E.D.Cal.2002) (internal citations omitted). The DNA Act permits disclosure of the DNA sample to criminal justice agencies for law enforcement identification in judicial proceedings and to a defendant for use in his criminal defense. 42 U.S.C. §§ 14135e(a)(b), 14132(b)(3).

The DNA Act restricts the use of information and criminalizes the knowing, unauthorized retention or disclosure of a DNA sample. 42 U.S.C. § 14135e(c). A person's DNA records can be expunged upon proof that a qualifying offense has been overturned or stricken. 42 U.S.C. § 14132(d).

The legislative history reveals that the impetus for the DNA Act was Congress' concern that the DNA data base was not sufficiently filled with samples from federal offenders.[6] H.R.Rep. No. 106–900(I), 2000 WL 142016 at 11. Congress was cognizant that all fifty states require DNA collection from certain convicted persons, while the federal system did not contain a comparable requirement. *See generally* Robin Cheryl Miller, Annotation, *Validity, Construction, and Operation of State DNA Database Statutes,* 76 A.L.R. 5th 239 at § 2 (2000). "Congress passed the Act because of an urgent need to address the gap in coverage of the national DNA index that has left out federal offenders." *United States v. Reynard,* 220 F.Supp.2d 1142, 1146 (S.D.Cal.2002). The addition of DNA samples from qualifying federal offenders, therefore, would enable state and federal law enforcement to match these samples with crime scenes or other evidence in an effort to solve pending criminal investigations. *Id.;* 2000 WL 1420163 at 13–14;

146 Cong. Rec. S11647, 2000 WL 1784925 at 4.

Another objective of the DNA Act was to promote accuracy in the criminal justice system since identification would likely exonerate those wrongly accused or convicted of a crime. 2000 WL 1784925 at 5. Since DNA sampling can easily exculpate as well as inculpate offenders, an ancillary benefit of the DNA Act will be releasing those wrongfully accused or convicted. The reliance of DNA analysis for this purpose demonstrates that "DNA testing is critical to the effective administration of justice in 21st century America." *Id.* The Congressional history also anticipates the DNA Act would reduce recidivism by incarcerating offenders before they have the opportunity to repeat their crimes in the future. 2000 WL 1784925.

Congress directed that the Administrative Office of the Courts ("AO") manage the practical implementation of the DNA Act, with respect to qualifying federal offenders on supervised release status.[7] (D.I. 216, Ex. A, Ex. B) In a December 21, 2001 memorandum to United States Probation Offices, the Assistant Director of the AO wrote: "Although Congress has not provided funding for the judiciary to do DNA collection, the Director [of the AO] has decided that probation offices should begin collecting blood samples as soon as possible." (*Id.*) The criteria to determine qualifying offenses and instructions for collection of the blood sample, procurement of health care services to extract the blood sample, and the payment procedure for such services was included in the memorandum. (*Id.* at Ex. D) Consistent with these instructions, the United States Pro-

---

6. Another concern was the high number of backlogged DNA samples that had not been entered into CODIS. To solve this problem, Congress allocated funds to assist the backlog. H.R.Rep. No. 106–900(I), 2000 WL 1420163 (2000).

7. The Attorney General is responsible for implementing the remaining portions of the DNA Act. 42 U.S.C. § 14135a(e)(1).

bation Office for the District of Delaware "identified the cases under supervision for qualifying offenses, received collection and fingerprint kits from the FBI, viewed training videos and procured DNA services" and then informed defendant of his September 25, 2002 appointment with a phlebotomist.[8] (*Id.*)

## III. DISCUSSION

### A. Fourth Amendment

As his first argument, defendant contends that the DNA Act violates the Fourth Amendment's prohibition against unreasonable searches and seizures because it compels extraction of blood for a DNA sample in the absence of individualized suspicion or probable cause of any criminal wrongdoing. (D.I.214) Defendant claims the government further infringes on his Fourth Amendment privacy interests when it chemically analyzes the sample taken.

The government responds that although the DNA Act implicates defendant's Fourth Amendment privacy interests, it is still a reasonable search under either the special needs exception to the warrant requirement or under a reasonableness standard analysis under the Fourth Amendment. (D.I.215)

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.; *see Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The Amendment "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the government or those acting at their direction." *Skinner v. Railway Labor Executives'*

*Ass'n,* 489 U.S. 602, 613, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

All searches and seizures must be reasonable. *Indianapolis v. Edmond,* 531 U.S. 32, 45, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). The test for what is reasonable is fact specific. *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). The "permissibility of a particular search is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402, (quoting, *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). In criminal cases, "we strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment." *Skinner,* 489 U.S. at 618, 109 S.Ct. 1402. A search without a warrant is intrinsically unreasonable and unconstitutional unless one of the exceptions to the warrant requirement is demonstrated. *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

### 1. Special Needs Doctrine

The Supreme Court has approved certain types of suspicionless searches where the purpose of the policy or program was designed to serve special needs, beyond the normal need for law enforcement, that make the warrant and probable cause requirement impracticable. *Skinner,* 489

8. The record fails to reflect the number of qualifying federal offenders identified for DNA sampling, nor the number of federal offenders who have already been tested by Delaware's United States Probation Office.

U.S. at 619, 109 S.Ct. 1402; *City of Indianapolis v. Edmond,* 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The special needs doctrine has been used to uphold certain suspicionless searches performed for reasons unrelated to law enforcement and is an exception to the general rule that a search must be based on individualized suspicion of wrongdoing. *Indianapolis v. Edmond,* 531 U.S. at 37, 121 S.Ct. 447; *see, e.g., Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (random drug testing of student athletes constitutional searches under the special needs exception because results of the drug tests not disclosed to law enforcement or used for internal disciplinary functions); *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (drug testing of federal employees upheld since program not designed for law enforcement and results not used in criminal prosecutions); *Skinner,* 489 U.S. at 620–621, 109 S.Ct. 1402 (drug and alcohol testing of railway workers upheld as within the special needs exception because the purpose of the policy was not the criminal prosecution of employees, but to prevent accidents and safety violations); *Board of Education of Independent School District No. 92 v. Earls,* 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (school policy requiring all students participating in competitive extracurricular activities to submit to drug testing permissible under the special needs doctrine).

▆▆▆ The special needs doctrine is reserved for exceptional circumstances to justify a search designed to serve non-law enforcement ends. Whether the special needs doctrine applies depends upon the purpose of the law or policy in issue. If the primary purpose is ordinary law enforcement, the special needs doctrine does not apply and the search cannot be upheld under the doctrine. *Id.* at 44, 48, 121 S.Ct. 447. However, once a non-ordinary law enforcement purpose is identified, the court conducts a reasonableness test balancing the individual's privacy interests against the government's special need. *Earls,* 536 U.S. at 829, 122 S.Ct. at 2565; *Ferguson v. City of Charleston,* 532 U.S. 67, 81, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001); *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402; *Von Raab,* 489 U.S. at 665–66, 109 S.Ct. 1384;

There is no dispute that the extraction of blood for the DNA sampling is a search.[9] Consequently, the issue is whether the DNA sampling is a valid suspicionless search under the special needs doctrine. While state DNA database statutes have been overwhelmingly upheld,[10] neither the Supreme Court nor any Circuit Court has reviewed the constitutionality of the DNA Act.[11] Notwithstanding this si-

---

**9.** The Supreme Court has recognized that a "compelled intrusion into the body for blood" is a Fourth Amendment search. *Schmerber v. California,* 384 U.S. 757, 767–68, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (warrantless blood test for alcohol content permissible). "It is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." *Id.* The Court, however, regards blood tests as minor intrusions without significant risk or pain inflicted on the individual. *Skinner,* 489 U.S. at 625, 109 S.Ct. 1402.

**10.** *See e.g. Roe v. Marcotte,* 193 F.3d 72 (2d Cir.1999) (Connecticut DNA statute upheld under special needs analysis); *Shelton v. Gudmanson,* 934 F.Supp. 1048 (W.D.Wis.1996) (Wisconsin DNA law constitutional under special needs doctrine even though ultimate purpose law enforcement); *Rise v. Oregon,* 59 F.3d 1556 (9th Cir.1995) (Oregon DNA statute rationally related to legitimate public interest of crime prevention).

**11.** Three district courts have examined the DNA Act in the following chronological order: 1) *Groceman v. U.S. Dept. of Justice,* 2002 WL

lence, the court finds the Supreme Court's recent decisions in *Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), and *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), dispositive. The decisions reflect the Court's refinement of the analysis to apply in special needs cases. Courts are urged to scour all available evidence to determine the primary purpose of the statute.[12] *Ferguson v. City of Charleston,* 532 U.S. at 82, 121 S.Ct. 1281.

In *Edmond,* the Supreme Court concluded that the city's vehicle drug checkpoint inspection program fell outside the protection of the special needs doctrine.[13] 531 U.S. at 44, 121 S.Ct. 447. The program was designed to discover and interdict illegal narcotics, a purpose the Court concluded was virtually indistinguishable from ordinary aspects of crime control. While acknowledging that other checkpoint stops have been validated under the special needs doctrine, the Court refused to extend this protection to a policy clearly designed as a means to discover evidence of ordinary criminal wrongdoing. *Id.* at 42, 121 S.Ct. 447; *compare United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (brief, suspi-

cionless highway checkpoint seizures near border constitutional under special needs exception because of government need to control border); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (highway sobriety checkpoint program designed to combat drunk driving was valid).

In *Ferguson,* the Court considered a hospital policy created by prosecutors, police and hospital staff that mandated drug testing of the urine of maternity patients suspected of using drugs. The patients did not consent to the testing nor were they aware of the tests or the potential disclosure to law enforcement. The patients discovered the policy after testing positive for drugs and being arrested. The patients were not given treatment for their drug use. The defendants steadfastly maintained that the purpose of the policy was for public health and the welfare of the mother and child. Nevertheless, the Supreme Court examined the impetus as well as practical application of the policy and concluded, instead, that law enforcement was the primary goal.

Significantly, the Court in *Ferguson* found law enforcement involvement pervasive at each stage of implementation: 1)

1398559 (N.D.Tex.2002) (court rejected federal inmate's argument that DNA Act sampling requirement was unconstitutional search and seizure and found statute authorized a reasonable search under Fourth Amendment); 2) *United States v. Reynard,* 220 F.Supp.2d 1142 (S.D.Cal.2002) (court ruled DNA Act constitutional under, *inter alia,* special needs doctrine); and 3) *United States v. Miles,* 228 F.Supp.2d 1130 (E.D.Cal.2002) (court found DNA sampling requirement based on old, prior conviction did not fall within special needs doctrine and, therefore, violated the defendant's Fourth Amendment rights).

**12.** Only the purpose of the program or policy is relevant, not the law enforcement officer's subjective intent. *Edmond,* 531 U.S. 32, 48, 121 S.Ct. 447, 148 L.Ed.2d 333.

**13.** "At each checkpoint location, the police [would] stop a predetermined number of vehicles. Approximately 30 officers [were] stationed at the checkpoint. Pursuant to written directives issued by the chief of police, at least one officer approache[d] the vehicle, advised the driver that he or she [was] being stopped briefly at a drug checkpoint, and ask[ed] the driver to produce a license and registration. The officer also look[ed] for signs of impairment and conduct[ed] an open-view examination of the vehicle from the outside." *Id.* at 35, 121 S.Ct. 447. A narcotics trained canine would be walked around the vehicles to alert for the presence of narcotics. During the four months the checkpoints were in place, narcotics were discussed at a rate of 9%.

the policy explanation and the testing policy procedures included police operational guidelines and references, including detailed explanations of chain of custody responsibilities with regard to urine samples; 2) there was a range of criminal charges available for violators; 3) the policy included procedures for police notification; 4) there were guidelines for the arrest of patients/suspects; 5) prosecutors and police were extensively involved in the daily operations of the policy; 6) the police decided who would receive the positive drug screen reports as well as what information should be included in the reports; 7) police and prosecutors had access to nurse files on patients who had tested positive for drugs; 8) police attended substance abuse team meetings; 9) police received regular copies of the medical teams' reports on progress; and 10) police coordinated the timing and circumstances of the arrests of the patients with hospital staff. *Id.* at 82, 121 S.Ct. 1281. Conspicuous by its absence was reference to available medical treatment for patients or their infants. The Court concluded that, "[w]hile the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence for law enforcement purposes in order to reach that goal." *Id.* at 84, 121 S.Ct. 1281.

The programs in *Edmond* and *Ferguson* were designed to discover and to produce evidence of particular criminal wrongdoing against specific persons. The DNA Act, however, was enacted to fill the CODIS system with DNA samples from qualifying federal offenders. This purpose is distinct from the regular needs of law enforcement. A DNA sample is evidence only of one's genetic code. By itself, the sample does not reflect that the donor committed a crime. Unlike a urinalysis which can reflect the presence of illegal substances, the DNA sample only offers the potential to link the donor with a crime. *See e.g. Nicholas v. Goord*, 2003 WL 256774 (S.D.N.Y.2003) (New York state DNA statute upheld under special needs exception). Only after the sample is analyzed and then evaluated against available crime scene samples can the results inculpate or exculpate an individual. The CODIS indexing only offers the potential to solve crimes. In light of the difficulty in analyzing all of the samples, a DNA sample could remain unmatched or even unanalyzed for an indefinite period. (D.I. 215 at 15 "[c]urrent matching ratio on CODIS is one match for every 1,000 new profiles, and the current backlog of analyzing samples means it is unlikely that there will be an increase in the matching ratio soon.") Moreover, testing pursuant to the DNA Act is directed at only those persons convicted of certain qualifying offenses. The identity of the individual is inconsequential.[14]

 Another distinction between the policies rejected in *Edmond* and *Ferguson* and the DNA Act rests with the immediate and ultimate goals of the programs. The Court identified this as a problem and cautioned:

> [B]ecause law enforcement involvement always serves some broader social purpose or objective, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in

---

**14.** There is no evidence of record to suggest that the DNA testing requirement has been directed at this particular defendant in an effort to solve a specific crime or is part of an ongoing criminal investigation. The court admonishes that if evidence to the contrary were established, the court would find the purpose of the DNA Act as applied to defendant would be ordinary law enforcement and, therefore, the special needs doctrine could not apply to validate the search.

terms of its ultimate, rather than immediate, purpose.

Such an approach is inconsistent with the Fourth Amendment.

*Ferguson,* at 84, 121 S.Ct. 1281. The court finds the immediate goal of the DNA Act is programmatic, designed to fill the CODIS system with samples from qualifying federal offenders to parallel all fifty states' requirements. A DNA data base containing federal and state offenders will promote the ultimate goals of solving past and future criminal investigations, exonerating the innocent and deterring recidivism. *See United States v. Reynard,* 220 F.Supp.2d at 1168; *United States v. Miles,* 228 F.Supp.2d at 1141.

Another significant distinction between the DNA Act and the policies rejected in *Edmond* and *Ferguson* is the pervasive law enforcement involvement in the creation as well as the implementation of the programs. The DNA Act does not utilize federal law enforcement to implement the requirements of the Act, as applied to supervised release defendants. Instead, members of the judicial branch, federal probation officers, are responsible for coordinating and enforcing the DNA Act. The use of probation officers, instead of law enforcement, suggests Congress' intent to isolate this area from the responsibility of ordinary law enforcement.

### 2. Reasonableness Analysis

Having concluded that the special needs doctrine applies, defendant's privacy interests must be assessed against the government's special need in order to determine whether the search is reasonable. As outlined above, Congress adopted the DNA Act to create a more complete CODIS system, which will spawn benefits to the public as well as defendants. On the other end of the equation are defendant's privacy rights. As an individual on supervised release, defendant enjoys reduced privacy

rights under the Fourth Amendment. *United States v. Reynard,* 220 F.Supp.2d at 1166. Although a warrant or individualized suspicion is necessary to conduct a search on members of the public at large, the Supreme Court has concluded that individuals on probation or supervised release must endure impingements to their privacy rights that negate the necessity of these safeguards. *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (warrantless search of probationer valid because of state's special need to supervise probationers and suspicion of criminal conduct); *United States v. Knights,* 534 U.S. 112, 121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (reasonable suspicion, not probable cause, was sufficient to compel a search of a probationer where such a search was specifically part of the conditions of probation imposed by the sentencing judge); *United States v. Hill,* 967 F.2d 902, 910–11 (3d Cir.1992) (warrantless search of parolee's store upheld as a special need of state).

Also factoring into this balancing test is the nature of the search. The extraction of blood is a minor intrusion that has become an accepted part of daily life. *Schmerber v. California,* 384 U.S. at 767–68, 86 S.Ct. 1826; *compare Board of Education v. Earls,* 536 U.S. at 824, 122 S.Ct. 2559 ("urination is an excretory function traditionally shielded by great privacy"). The DNA sampling of defendant was to be taken by a blood test administered by a phlebotomist, pursuant to the AO guidelines. There is nothing of record to suggest that the testing, had it occurred, would have been more invasive than the ordinary measures used to extract blood.

Weighing the special need for DNA testing against defendant's diminished expectation of privacy and the minor intrusiveness of a blood test, the court finds the DNA Act testing requirements reasonable.

## B. Separation of Powers

Defendant next asserts that the DNA Act violates the Separation of Powers doctrine by requiring probation officers to perform law enforcement duties. (D.I.214) Since the DNA Act requires probation officers to collect, even by force, DNA samples, defendant claims the judicial branch inappropriately mixes with the executive branch of government.

Pursuant to 18 U.S.C. § 3603, probation officers are part of the judicial branch. "The Constitution limits the exercise of judicial power to cases and controversies." *United States v. Reynard*, 220 F.Supp.2d 1142, 1170 (S.D.Cal.2002). Probation officers provide information to and perform advisory and supervisory functions for the court. Law enforcement falls under the executive branch. The Supreme Court has recognized that the three branches of government cannot be mutually exclusive, however, the Constitution prohibits one branch from encroaching upon the duties of another branch. *Miller v. French*, 530 U.S. 327, 341–42, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000).

The principle of Separation of Powers is the foundation of our tripartite system of government. *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Supreme Court has consistently reaffirmed "the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate branches is essential to the preservation of liberty." *Id.; Morrison v. Olson*, 487 U.S. 654, 685–696, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). The practical application of this doctrine has compelled the Court to recognize that "while our Constitution mandates that each of the three general departments of government must remain entirely free from the control or coercive influence, direct or indirect of, either of the others, the Framers did not require—and—indeed rejected—the notion that the three Branches must be entirely separate and distinct." *Id.*

In *Mistretta v. United States*, 488 U.S. at 372, 109 S.Ct. 647, the Supreme Court determined that the Sentencing Guidelines do not violate the Separation of Powers doctrine. The implementation of the Sentencing Guidelines has expanded the role of the Office of Probation and the responsibilities of probation officers. A probation officer's duties include that of assuring a defendant obeys the conditions of his sentence imposed by the court and may require taking urine samples to screen for drugs. If the probation officer determines there is a violation of a condition of supervised release, a memorandum and petition are prepared for the court. (*See e.g.* D.I. 216) This reporting by the probation officer has a law enforcement aspect. The court finds, however, this is a result of the practical function of governing that "mandates some overlap of responsibility and interdependence among the branches" and does not violate the Separation of Powers Doctrine. *Id.* at 381, 109 S.Ct. 647.

## C. Ex Post Facto Clause

Defendant's third argument is that the DNA Act violates the *Ex Post Facto* clause because it operates retroactively and increases the punishment for his conviction beyond that available at the time the offenses were committed. (D.I.214) The government asserts that under the Supreme Court's recent decision in *Smith v. Doe*, —— U.S. ——, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), application of the DNA Act to defendant is not a violation of the *Ex Post Facto* Clause. The court agrees.

Article I, § 9, cl. 3, of the United States Constitution provides, in part, that no *ex post facto* law shall be passed by

Congress. To demonstrate a violation of the *Ex Post Facto* clause, defendant must demonstrate "that the law he challenges operates retroactively (that it applies to conduct completed before its enactment) and that it raises the penalty from whatever the law provided when he acted." *Johnson v. United States,* 529 U.S. 694, 699, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000). The Supreme Court reexamined this area recently in its decision in *Smith v. Doe,* ––– U.S. –––, 123 S.Ct. 1140, 155 L.Ed.2d 164. The key to determining whether a law constitutes retroactive punishment is whether the legislature meant the statute to establish civil proceedings. *Id.* at 1144; *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). The inquiry ends if the "intention of the legislature was to impose punishment." *Id.* However, if "the intention was to enact a regulatory scheme that is civil and nonpunitive," then the court must "examine whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it civil.'" *Id.* (quoting *United States v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). In so doing, the Court has directed that deference be afforded to the stated legislative intent and only "the clearest proof will suffice to override legislative intent and transform what had been denominated a civil remedy into a criminal penalty." *Id.* at 1140 (quoting *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)).

Defendant contends that the *Ex Post Facto* clause has been violated because the DNA Act was enacted approximately six years after he was sentenced for bank robbery. The law in effect at the time of defendant's conviction did not permit the taking of blood samples for DNA testing for individuals similarly situated. Defendant argues that the DNA Act operates retroactively and increases the punishment given for his original crime. Defendant further argues that since anyone who refuses to submit can be forced to submit, 42 U.S.C. § 14135a(a)(4), and is susceptible to supervised revocation which may result in incarceration or increased restrictions of supervised release, 42 U.S.C. § 14135c, the DNA Act has a punitive affect. He asserts that the penal nature of the DNA Act is evidenced in 42 U.S.C. § 14132(d), which provides that if a person's conviction is overturned, the DNA sample is removed from the DNA bank. "If the taking and the storing of the DNA sample was not considered punishment or to be an infringement on a person's Constitutional rights, then Congress would not have felt it necessary to expunge a person's DNA sample from the index if the person's conviction is overturned." (D.I. 214, at 12)

Consistent with the analysis in *Smith v. Doe,* ––– U.S. –––, 123 S.Ct. 1140, 155 L.Ed.2d 164, the first inquiry is whether the statute is penal. The legislative history does not reflect that Congress enacted the DNA Act for punitive purposes. Instead, it is clear that Congress enacted the statute to create a federal DNA bank of offenders to parallel those already established by all 50 state legislatures. A defendant's refusal to be tested and not the underlying conviction is what exposes him to penalties under the DNA Act. These possible sanctions do not punish for conduct in the past, i.e., the original criminal conviction, but instead are the result of noncompliance with the present conditions. The DNA Act is not unlike other regulatory legislation that provides for criminal sanctions for noncompliance. *See generally,* Migratory Bird Treaty Act, 16 U.S.C. § 703; Clean Air Act, 42 U.S.C. 7413.

## IV. CONCLUSION

For the reasons stated, the court finds defendant's opposition to the extraction of

a DNA sample pursuant to the DNA Act without merit. An order consistent with this memorandum opinion shall issue.