2003 ND 66

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**James Elwood NORMAN, Defendant and Appellant.**

No. 20020172.

Supreme Court of North Dakota.

April 24, 2003.

Cynthia M. Feland, Assistant State's Attorney, Bismarck, ND, for plaintiff and appellee.

Kent M. Morrow, Severin, Ringsak & Morrow, Bismarck, ND, for defendant and appellant.

Jonathan R. Byers, Assistant Attorney General, Attorney General's Office, Bismarck, ND, for amicus curiae North Dakota Attorney General.

VANDE WALLE, Chief Justice.

[¶ 1] James Elwood Norman appealed from a district court order denying his motion to quash an earlier order which required him to provide a deoxyribonucleic acid ("DNA") sample under N.D.C.C. § 31–13–03. We affirm.

## I

[¶ 2] In 1992, a jury found Norman guilty of class AA felony murder for killing his wife Pamela Norman. *See State v. Norman*, 507 N.W.2d 522, 523 (N.D.1993) (affirming conviction). He received a sentence of life in prison and is currently in the custody of the Department of Corrections and Rehabilitation ("Department").

[¶ 3] The Legislature enacted N.D.C.C. ch. 31–13 in 1995 to provide for DNA testing and a DNA data base. *See* 1995 Sess. Laws ch. 325. As originally enacted, N.D.C.C. § 31–13–03 limited DNA testing to individuals convicted of certain sexual offenses or attempted sexual offenses. The Legislature amended § 31–13–03 in 2001 to expand DNA testing to include certain nonsexual felony offenses. *See* 2001 N.D. Sess. Laws ch. 302, § 1. The 2001 version of § 31–13–03 (emphasis added), states:

> The court shall order any person convicted on or after August 1, 1995, of any sexual offense or attempted sexual offense in violation of sections 12.1–20–03, 12.1–20–03.1, 12.1–20–04, 12.1–20–05, 12.1–20–06, subdivision e or f of subsection 1 of section 12.1–20–07, or section 12.1–20–11 or any other offense when the court finds at sentencing that the person engaged in a nonconsensual sexual act or sexual contact with another person during, in the course of, or as a

result of, the offense and any person who is in the custody of the department after July 31, 1995, as a result of a conviction of one of these offenses to have a sample of blood or other body fluids taken by the department for DNA law enforcement identification purposes and inclusion in law enforcement identification data bases. *The court shall order any person convicted after July 31, 2001, of a felony offense contained in chapter 12.1–16, 12.1–17, or 12.1–18, section 12.1–22–01, or chapter 12.1–27.2 and any person who is in the custody of the department after July 31, 2001, as a result of a conviction for one of these offenses to have a sample of blood or other body fluids taken by the department for DNA law enforcement identification purposes and inclusion in the law enforcement identification data bases.* Notwithstanding any other provision of law, if the sentencing court has not previously ordered a sample of blood or other body fluids to be taken, the court retains jurisdiction and authority to enter an order that the convicted person provide a sample of blood or other body fluids as required by this section. Any person convicted after July 31, 1995, who is not sentenced to a term of confinement shall provide a sample of blood or other body fluids as a condition of the sentence or probation at a time and place specified by the sentencing court. The sentencing court shall assess the cost of the procedure against the person being tested. The department shall collect the cost of the procedure from the person being tested and transfer the amount collected to the state department of health for deposit in the general fund.[1]

---

1. In 2003, the Legislature amended the portion of § 31–13–03 at issue in this case to read:

> The court shall order any person convicted after July 31, 2001, of a felony offense contained in chapter 12.1–16, 12.1–17, or 12.1–

Norman's conviction for class AA felony murder is a felony offense contained in N.D.C.C. ch. 12.1–16.

[¶ 4] In December 2001, the State moved the district court to order Norman provide a DNA sample under N.D.C.C. § 31–13–03. Without a hearing or providing him notice, the court ordered Norman to "provide a sample of blood and body fluids ... for DNA law enforcement identification purposes and inclusion in law enforcement identification data bases in accordance with the provisions of N.D.C.C. ch. 31–13." In practice, DNA samples in North Dakota are obtained using an oral swab.

[¶ 5] Norman moved to quash the order and for an injunction to stay the collection of the DNA sample. Upon Norman's request, the district court appointed an attorney to represent him. The court postponed the testing until it ruled on his motion and ordered no sanctions be taken against him. Norman's present counsel is the fourth appointed attorney in this case; the other three attorneys were allowed to withdraw because of conflicts.

[¶ 6] Among his many arguments against providing a DNA sample, Norman challenged the constitutionality of § 31–13–03 on ex post facto grounds; therefore, the Attorney General responded by filing a brief defending the statute's constitutionality. Following a June 2002 hearing, the district court issued an order denying Norman's earlier motion to quash the order which required him to provide a DNA sample. The court determined § 31–13–03 was retroactive and Norman was subject to its requirements. Furthermore, the appointment of counsel and the hearing had satisfied his rights to due process. Norman moved to stay the collection of the DNA sample pending this appeal, and the district court granted his motion.

[¶ 7] On appeal, Norman challenges N.D.C.C. § 31–13–03 on multiple grounds: the district court erred in finding § 31–13–03 is retroactive and in finding Norman's 1992 murder conviction and status as an inmate require he provide a DNA sample; section 31–13–03 is an impermissible ex post facto law; the statute violates his Fifth Amendment right against self-incrimination; and the court erred in finding Norman would not suffer new legal consequences by refusing to provide a DNA sample.

## II

[¶ 8] All fifty states have statutes establishing DNA testing and DNA data bases.[2] *Landry v. Attorney General*, 429

---

18, section 12.1–22–01, or chapter 12.1–27.2 *or* any person who is in the custody of the department after July 31, 2001, as a result of a conviction for one of these offenses to have a sample of blood or other body fluids taken by the department for DNA law enforcement identification purposes and inclusion in the law enforcement identification data bases.

HB 1235, 58th Leg. Assem., Reg. Sess. (N.D. 2003) (emphasis added).

2. The states' statutory schemes vary in their *structure and the included offenses* which mandate DNA testing. *See, e.g.,* Alaska Stat. § 44.41.035 (establishing DNA testing for individuals convicted of crimes against a person, burglary, and a felony attempt to commit burglary, including minors 16 years of age or older adjudicated as a delinquent for an act that would be one of those crimes if committed by an adult); Cal.Penal Code §§ 295, 296 (including offenders of enumerated crimes found not guilty by reason of insanity); Conn. Gen.Stat. § 54–102g (limiting DNA testing to certain sexual offenders); Minn.Stat. § 609.117 (including multiple offenses from murder and assault to false imprisonment and indecent exposure); Miss.Code Ann. § 45–33–37 (including only sexual offenders); Mont. Code Ann. § 44–6–102 (including felony offenders and youths found to have committed a sexual or violent offense).

Mass. 336, 709 N.E.2d 1085, 1087 (1999). The federal government also has a national index, or data base, of DNA samples which includes samples taken from persons convicted of crimes, recovered from crime scenes or unidentified human remains, and contributed from the relatives of missing persons. *See* 42 U.S.C. § 14132.

[¶ 9] Challengers to DNA data base statutes have raised issues such as cruel and unusual punishment, equal protection, prohibition against ex post facto laws, free exercise of religion, procedural and substantive due process, right to privacy, the Fifth Amendment right against self-incrimination, separation of powers, and the Fourth Amendment right against unreasonable search and seizure. *See generally* Robin Cheryl Miller, Annotation, *Validity, Construction, and Operation of State DNA Database Statutes,* 76 A.L.R. 5th 239 (2003). These cases demonstrate challengers often raise several of these issues on appeal, and generally, these arguments have been unsuccessful. *Id.*

[¶ 10] We recently upheld N.D.C.C. § 31–13–03, as amended in 2001, against an equal protection challenge. *State v. Leppert,* 2003 ND 15, ¶ 1, 656 N.W.2d 718. As stated in *Leppert,* "[c]ourts have generally upheld DNA testing of convicted persons against various constitutional challenges." *Id.* at ¶ 10 (citing multiple cases in which DNA testing was upheld on appeal). *But see id.* at ¶ 22 (Maring, J., concurring in the result) (comparing two courts' holdings in Fourth Amendment challenges to DNA sampling). This opinion is limited to the issues raised by Norman on appeal.

### III

#### A

[¶ 11] Norman argues the district court erred in finding N.D.C.C. § 31–13–03 is retroactive. He asserts a plain reading of this portion of the statute demonstrates § 31–13–03 is clearly not retroactive:

> The court shall order any person convicted after July 31, 2001, of a felony offense contained in chapter 12.1–16, 12.1–17, or 12.1–18, section 12.1–22–01, or chapter 12.1–27.2 and any person who is in the custody of the department after July 31, 2001, as a result of a conviction for one of these offenses....

Thus, Norman asserts § 31–13–03 applies only to a person who was *both* convicted after July 31, 2001, and in departmental custody after July 31, 2001. Because he was not convicted after July 31, 2001, the statute should not apply to him. If the statute was intended to specify two separate categories of people, punctuation, such as a comma, would have been inserted before the conjunction "and."

[¶ 12] The State asserts N.D.C.C. § 31–13–03, by its clear and unambiguous language, is retroactive. As the Attorney General noted in its amicus curiae brief and the State asserted at oral argument, the use of the subject "any person" twice lends to an interpretation that two separate categories of people were intended by the statute: (1) individuals convicted after July 31, 2001, of the enumerated offenses, and (2) individuals in the Department's custody after July 31, 2001, because of a conviction for those offenses. If only one category of people was intended, repetition of the subject "any person" would be unnecessary.

[¶ 13] Under N.D.C.C. § 1–02–10, "[n]o part of this code is retroactive unless it is expressly declared to be so." A statute need not explicitly use the term "retroactive" for it to be applied to facts occurring before the effective date of the statute. *Overboe v. Farm Credit Servs.,* 2001 ND 58, ¶ 8, 623 N.W.2d 372. Section 1–02–10 is a rule of statutory construction,

and as a rule of construction, it "is subservient to the goal of statutory interpretation: to ascertain and effectuate legislative intent." *State v. Davenport*, 536 N.W.2d 686, 688 (N.D.1995) (quoting *State v. Cummings*, 386 N.W.2d 468, 471–72 (N.D. 1986)). If we can rationally infer from other sources that the Legislature intended retroactive application of a statute, we do not need to resort to § 1–02–10 to determine legislative intent. *Id.* at 689 (citing *Cummings*, 386 N.W.2d at 472).

[¶ 14] As we have previously stated:

The interpretation of a statute is fully reviewable on appeal. Our primary objective in construing a statute is to ascertain the intent of the Legislature by looking at the language of the statute itself and giving it its plain, ordinary, and commonly understood meaning. Although courts may resort to extrinsic aids to interpret a statute if it is ambiguous, we look first to the statutory language, and if the language is clear and unambiguous, the legislative intent is presumed clear from the face of the statute.

*Overboe*, 2001 ND 58, ¶ 9, 623 N.W.2d 372 (citations omitted).

[¶ 15] Both parties assert § 31–13–03, on its face, clearly supports their respective positions. After examining the language of § 31–13–03, giving it its plain, ordinary, and commonly understood meaning, we agree the repeated use of the subject "any person" supports the conclusion that the Legislature intended the provision to include two separate categories of individuals: "The court shall order *any person* convicted after July 31, 2001, of a felony offense contained in chapter 12.1–16, 12.1–17, or 12.1–18, section 12.1–22–01, or chapter 12.1–27.2 *and any person* who is in the custody of the department after July 31, 2001 ..." N.D.C.C. § 31–13–03

(emphasis added). Although this interpretation seems most reasonable from a plain reading of the statute, Norman's interpretation is not untenable. *Cf. Hilton v. N.D. Educ. Ass'n*, 2002 ND 209, ¶ 10, 655 N.W.2d 60 (stating a statute subject to different, but rational meanings is ambiguous). When a statute is ambiguous, we may resort to extrinsic aids, such as legislative history, to construe an ambiguous provision. *Id.;* N.D.C.C. § 1–02–39. In construing an ambiguous statute which affects public interest, we prefer an interpretation favoring the public. *State v. Burr*, 1999 ND 143, ¶ 12, 598 N.W.2d 147 (citation omitted).

[¶ 16] The entire legislative history of N.D.C.C. § 31–13–03, as amended in 2001, demonstrates cost was an important consideration in expanding the offenses included in the data base. The original bill would have applied to a greater number of felony offenses. *Hearing on H.B. 1208 Before the Senate Judiciary Comm.*, 57th Leg. Assem. (Mar. 5, 2001) (testimony of Representative Lawrence Klemin). However, due to the costs of such testing, the final bill was limited to testing individuals convicted of the enumerated, primarily violent, felony offenses.

[¶ 17] Although the projected fiscal effects of this bill changed over the 2001 legislative session, the estimated number of offenders and cost for the first biennium were always greater than the estimated number of offenders and cost in the subsequent biennium. The Director of the Crime Laboratory Division of the Department of Health explained this "drop in numbers" resulted from "having to profile all current offenders in custody as of July 31, 2000(sic). That would get us caught up. It is estimated that we would have another 550 people to profile after that every year." *Hearing on H.B. 1208 Before the House Judiciary Comm.*, 57th

Leg. Assem. (Jan. 24, 2001) (testimony of Kenan Bullinger, Crime Laboratory Director). The bill's primary sponsor also explained why the number of individuals to be tested was greater the first year, compared to subsequent years, stating "[t]he reason the number is higher the first year is to take into account the present prison population and the present parole/probation population." *Hearing on H.B. 1208 Before the House Appropriations Comm.*, 57th Leg. Assem. (Feb. 14, 2001) (memo of Representative Lawrence Klemin).

[¶ 18] As noted, the cost of this amendment was a significant concern. To decrease the ultimate cost of the testing, the Legislature decreased the enumerated offenses the DNA testing statute would encompass. Although not testing "the present prison population and the present parole/probation population" also would have decreased costs, the legislative history does not indicate consideration of such an alternative proposal.

[¶ 19] The underlying purpose of this bill, reflected in the legislative history, demonstrates the Legislature's intent to further expand the DNA data base. The goals were to increase success rates of solving crimes in North Dakota and other states, exonerate innocent suspects, and aid in identifying those who commit future crimes. *Hearing on H.B. 1208 Before the House Judiciary Comm.*, 57th Leg. Assem. (Jan. 24, 2001) (testimony of Representative Lawrence Klemin). These goals would be further advanced by including those inmates already incarcerated for the newly included offenses. Therefore, after reviewing the legislative history of N.D.C.C. § 31–13–03, we conclude the Legislature intended the expanded DNA testing to include individuals in the custody of the department after July 31, 2001, as a result of a conviction for one of the specified offenses.

[¶ 20] Furthermore, we conclude the court had no discretion in ordering Norman to provide a sample. Section 31–13–03 states "[t]he court shall order...." As we have previously stated:

> Ordinarily, the word "shall" in a statute creates a mandatory duty. The word "shall" is "generally imperative or mandatory ... excluding the idea of discretion, and ... operating to impose a duty." Where necessary to effect the intent of the legislature, however, the word "shall" will be interpreted as creating a duty that is merely directory. If the duty prescribed in the statute is essential to its main objectives, the word "shall" is to be construed as creating a mandatory duty.

*Sweeney v. Sweeney*, 2002 ND 206, ¶ 17, 654 N.W.2d 407 (citations omitted). After examining § 31–13–03 and its legislative history, we cannot conclude the Legislature intended this portion of the statute to be directory. Because we construe "shall" according to its ordinary meaning—creating a mandatory duty—the court was required to order Norman submit a sample for DNA testing after it determined § 31–13–03 applied to Norman. Therefore, the district court did not err in determining the statute was retroactive and applied to Norman because of his 1992 murder conviction and his current status as an inmate.

**B**

[¶ 21] Norman's statement of the issues also contains an ex post facto challenge to N.D.C.C. § 31–13–03. We have stated the Legislature may apply statutes retroactively unless doing so would result in ex post facto application. *State v. Shafer–Imhoff*, 2001 ND 146, ¶ 42, 632 N.W.2d 825 (citing *State v. Burr*, 1999 ND 143, 598 N.W.2d 147). A law which imposes a collateral consequence of a conviction may be applied retroactively if the

purpose is to protect some other legitimate interest, rather than to punish the offender. *Burr*, at ¶ 11. The constitutionality of a statute is a question of law, and we uphold the statute unless its challenger can demonstrate the statute's unconstitutionality. *Best Products Co. v. Spaeth*, 461 N.W.2d 91, 96 (N.D.1990). A party raising a constitutional challenge "should bring up the heavy artillery or forego the attack entirely." *State v. Clark*, 2001 ND 194, ¶ 9, 636 N.W.2d 660 (quoting *Jarvis v. Jarvis*, 1998 ND 163, ¶ 33, 584 N.W.2d 84).

[¶ 22] Norman purports to raise a generalized ex post facto challenge to N.D.C.C. § 31–13–03, but he fails to develop this argument or articulate this assertion from his retroactivity argument. This Court will only decide those issues which have been thoroughly briefed and argued. *Olander Contr. Co. v. Gail Wachter Invs.*, 2002 ND 65, ¶ 32, 643 N.W.2d 29. "An issue not supported by argument in a brief will not be considered on appeal." *Murchison v. State*, 1998 ND 96, ¶ 13, 578 N.W.2d 514. Accordingly, we do not decide Norman's ex post facto argument.

[¶ 23] However, our research has revealed multiple cases, not cited in Norman's appellate brief, in which courts have addressed and rejected ex post facto challenges to DNA testing statutes. For example, in *Rise v. Oregon*, 59 F.3d 1556, 1562 (9th Cir.1995), a group of convicted sex offenders presented an ex post facto argument in their challenge to Oregon's DNA testing statute, arguing it increased their "punishment" for past convictions. The *Rise* court held the state could require the offenders to provide DNA samples because the purpose of the statute was "to create a DNA data bank to assist in the identification, arrest, and prosecution of criminals, not to punish convicted murderers and sexual offenders." *Id.* (stating the

Ex Post Facto Clause is not violated by every change in a convicted individual's situation).

[¶ 24] Similarly, in *Shaffer v. Saffle*, 148 F.3d 1180, 1181 (10th Cir.1998), Shaffer, an inmate, challenged Oklahoma's DNA testing scheme. In one argument, Shaffer asserted applying the statute to him violated the Ex Post Facto Clause because the law became effective after he was convicted. *Id.* at 1182. The Tenth Circuit rejected his argument. *Id.* The court noted other circuits had upheld similar testing schemes against similar challenges, holding these statutes do not violate the Ex Post Facto Clause because they have a legitimate, non-penal legislative purpose. *Id.* Furthermore, legislative intent clearly supported a retroactive application of the statute to inmates in Shaffer's position. *Id.*

[¶ 25] Numerous other courts have followed similar reasoning and rejected ex post facto challenges. *See, e.g., Gilbert v. Peters*, 55 F.3d 237, 238–39 (7th Cir.1995); *Ewell v. Murray*, 11 F.3d 482, 486 (4th Cir.1993); *Jones v. Murray*, 962 F.2d 302, 309 (4th Cir.1992); *United States v. Reynard*, 220 F.Supp.2d 1142, 1162 (S.D.Cal. 2002); *Kruger v. Erickson*, 875 F.Supp. 583, 589 (D.Minn.1994); *Vanderlinden v. Kansas*, 874 F.Supp. 1210, 1216 (D.Kan. 1995), *aff'd sub nom. Schlicher v. Peters*, 103 F.3d 940 (10th Cir.1996); *Matter of Appeal in Maricopa County Juvenile Action Nos. JV–512600 and JV–512797*, 187 Ariz. 419, 930 P.2d 496, 500 (Ct.App.1996); *Doe v. Gainer*, 162 Ill.2d 15, 204 Ill.Dec. 652, 642 N.E.2d 114, 116–17 (1994); *Cooper v. Gammon*, 943 S.W.2d 699, 704, 707 (Mo.App.1997); *Kellogg v. Travis*, 188 Misc.2d 164, 728 N.Y.S.2d 645, 647 (2001 N.Y. Sup.Ct.); *Dial v. Vaughn*, 733 A.2d 1, 4–5 (Pa.Commw.Ct.1999). *Cf. State v. Burr*, 1999 ND 143, ¶ 36, 598 N.W.2d 147 (concluding North Dakota's sex offender

registration statute is regulatory, not punitive, and is not an ex post facto law); *see also Smith v. Doe,* — U.S. —, —, 123 S.Ct. 1140, 1154, 155 L.Ed.2d 164, — (2003) (holding retroactive application of Alaska's sex offender registration law does not violate the Ex Post Facto Clause); *United States v. Sczubelek,* No. 94–8–SLR, 2003 WL 1818109, 2003 U.S. Dist. LEXIS 5721 (D. Del. April 2, 2003).

C

[¶ 26] Norman also contends the DNA testing violates his Fifth Amendment right against self-incrimination. In *Schmerber v. California,* 384 U.S. 757, 764–65, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the U.S. Supreme Court held blood test evidence, even if potentially incriminating, is neither testimony nor evidence relating to any communicative act. The Supreme Court concluded an involuntary seizure of a blood sample does not implicate the Fifth Amendment privilege. *Id.; see also State v. Fasching,* 453 N.W.2d 761, 763 (N.D. 1990) (stating "[n]on-testimonial, 'physical' evidence can be obtained and used without regard to the Fifth Amendment privilege against self-incrimination"). *Cf. Hampson v. Satran,* 319 N.W.2d 796, 800 (N.D.1982) (stating the penitentiary's urine testing program does not violate a prisoner's Fifth Amendment right against self-incrimination because the testing program involves the gathering of real or physical evidence rather than testimonial or communicative evidence).

[¶ 27] Other courts have rejected claims which allege requiring an individual to provide a DNA sample amounts to compulsory self-incrimination. *See Shaffer v. Saffle,* 148 F.3d 1180, 1181 (10th Cir.1998); *Boling v. Romer,* 101 F.3d 1336, 1340 (10th Cir.1996) (concluding requiring DNA samples from inmates is not compulsory self-incrimination because DNA samples are not testimonial in nature); *Johnson v. Commonwealth,* 259 Va. 654, 529 S.E.2d 769, 779 (2000); *Cooper v. Gammon,* 943 S.W.2d 699, 705 (Mo.Ct.App.1997). We conclude obtaining a DNA sample by oral swab under N.D.C.C. § 31–13–03 does not violate the Fifth Amendment privilege against self-incrimination.

D

[¶ 28] Norman asserts the district court erred in finding he would not suffer negative consequences by refusing to provide a DNA sample. Norman claims by failing to submit a sample he will be held beyond his release date. He cites *Jones v. Murray,* 962 F.2d 302, 310 (4th Cir.1992), which held unconstitutional the portion of Virginia's DNA sampling statute conditioning an inmate's release or mandatory parole upon submitting a DNA sample. In *Jones,* the Fourth Circuit concluded detaining inmates who had reached their mandatory parole date violated the prohibition against ex post facto laws. *Id.* However, in examining the record in this case, we note the court made no findings regarding the impact on Norman should he refuse to submit to the testing. The record does not support any assertion that Norman's release date will be delayed by his failure to submit.

[¶ 29] When Norman first refused to submit to testing, the director of prisons division did send him written notice, stating Norman's failure to comply would "result in disciplinary action being taken, up to and including loss of job." Norman did not address this type of negative consequence in his appellate brief. Due to the district court's order, no sanctions were imposed on Norman. Furthermore, in challenges to DNA testing schemes, other courts have concluded disciplinary actions as a result of testing noncompliance are part of prison administration and regula-

tion. *See, e.g., Gilbert,* 55 F.3d at 239; *Kruger,* 875 F.Supp. at 589 n. 7. In *Jones v. Murray,* the case cited by Norman, an ex post facto challenge on these grounds was rejected. *Jones,* 962 F.2d at 310. The court reasoned inmates refusing to provide a DNA sample who had not reached their mandatory parole date could be punished administratively, and such punishment would not violate the prohibition against ex post facto laws:

> It is precisely because reasonable prison regulations, and subsequent punishment for infractions thereof, are contemplated as part of the sentence of every prisoner, that they do not constitute additional punishment and are not classified as ex post facto. Moreover, since a prisoner's original sentence does not embrace a right to one set of regulations over another, reasonable amendments, too, fall within the anticipated sentence of every inmate. We therefore conclude that neither [the] blood-testing requirement, itself, nor the infliction of punishment within the terms of the prisoners' original sentence for a violation of the requirement, is ex post facto. (citations omitted).

*Jones,* at 309–10; *see also Ewell,* 11 F.3d at 487 (stating an inmate's refusal to comply with DNA sampling may be enforced using administrative punishments because DNA testing is administrative, not penal). *Cf. Ennis v. Schuetzle,* 488 N.W.2d 867, 871–72 (N.D.1992) (holding the warden had the statutory authority to revoke an inmate's favored status in housing and work assignments for violating prison rules); *Jensen v. Powers,* 472 N.W.2d 223, 225 (N.D.1991) (stating the "[d]eprivation of a prisoner's privileges does not infringe on any recognized right of a prison inmate").

[¶ 30] We conclude Norman has not supported his claim that the district court erred in finding he would not suffer nega-

tive consequences for failing to submit, in the record or his brief.

## IV

[¶ 31] We hold N.D.C.C. § 31–13–03 applies (1) to a person convicted after July 31, 2001, of a felony offense contained in chapter 12.1–16, 12.1–17, or 12.1–18, section 12.1–22–01, or chapter 12.1–27.2; and (2) to a person who is in the custody of the department after July 31, 2001, as a result of a conviction for one of these offenses. Because we have rejected the other issues raised by Norman, we affirm the district court order denying Norman's motion to quash the earlier court order which required him to provide a DNA sample.

[¶ 32] LAURIE A. FONTAINE, D.J., CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and WILLIAM A. NEUMANN, JJ., concur.

[¶ 33] The Honorable LAURIE A. FONTAINE, D.J., sitting in place of SANDSTROM, J., disqualified.